**SECURITIES AND EXCHANGE COMMISSION, Plaintiff-Appellant,**

v.

**D. Doyle MIZE et al., Defendants-Appellees.**

No. 78–1049.

United States Court of Appeals, Fifth Circuit.

April 23, 1980.

Rehearing and Rehearing En Banc Denied May 21, 1980.

Woodard, Henry & Primm, Robert A. Hall, Roger R. Wright, Jr., Houston, Tex., for defendants-appellees.

Before MORGAN, REAVLEY and HATCHETT, Circuit Judges.

LEWIS R. MORGAN, Circuit Judge:

The Securities and Exchange Commission brought this action to permanently enjoin D. Doyle Mize, Farnham Corporation, and others[1] from engaging in future violations of the antifraud and tender offer provisions of the federal securities laws, Section 17(a) of the Securities Act of 1933, 15 U.S.C. § 77q(a); Sections 10(b), 14(d), and 14(e) of the Securities and Exchange Act of 1934, 15 U.S.C. § 78j(b), and 78n(d), and 78n(e), and Rules 10b–5 and 14d–1 thereunder, 17 C.F.R. 240.10b–5 and 240.14d–1. After a hearing, the District Court for the Southern District of Texas entered a judgment for defendants denying injunctive relief. On appeal, the SEC contends that the court misinterpreted the evidence and applied an erroneous legal standard in assessing the materiality of certain facts in this case.

I.

D. Doyle Mize (Mize), the principal figure in this action, was chairman of the board of directors and chief executive officer of Southdown, Inc. (Southdown) and later of Valhi, Inc. (Valhi), a wholly-owned subsidiary of Southdown. The gravamen of the SEC's complaint is that Mize and certain of his business associates made repeated secret attempts to gain personal voting control of Valhi at prices below book value. To effectuate their scheme, defendants allegedly filed with the SEC and disseminated to the

Harvey Pitt, Gen. Counsel, Paul Gonson, Asst. Gen. Counsel, John M. Mahoney, Sp. Counsel, Frederic Townsend, Atty., Richard E. Brodsky, Sp. Counsel, Michael K. Wolensky, Securities & Exchange Comm., Washington, D.C., for plaintiff-appellant.

1. The SEC's complaint named the following parties as defendants in the action: D. Doyle Mize; Southdown, Inc.; Valhi, Inc.; Farnham Corporation; Leland McCarthy; and Richard McCarthy. The McCarthys, Valhi, Inc. and Southdown, Inc. consented, without admitting or denying the allegations in the complaint, to the entry of permanent injunctions against further violations of the securities laws. Southdown, Inc. also consented to the establishment and maintenance of various procedures designed to prevent further securities laws violations.

public various documents which contained both affirmative misstatements and material omissions of fact. The defendants respond that Mize made every effort to comply with the federal securities laws and engaged in no act or practice which in any way violated those laws.

## BACKGROUND

Southdown is a publicly-held Louisiana corporation headquartered in Houston, Texas, whose stock is registered with the SEC and traded on the New York Stock Exchange. During the early 1970s, Southdown was engaged, through its subsidiaries, in the production and marketing of cement, sugar, malt beverages, soft drink beverages, table wines and other consumer products. The company was also engaged in oil and gas operations and had large scale agricultural land development and farming interests. The company's agricultural operations were conducted through its Valhi subsidiary.

In 1971 the Southdown board of directors determined that the company's agricultural subsidiary was financially incompatible with Southdown's other business endeavors and was actually depressing the value of Southdown's stock. The directors reasoned that investors interested in the stable, current yield associated with Southdown's manufacturing operations were attributing little, if any, significance to the high risk—high profit features and long-term growth requirements of the company's farming business. For this reason, the board proposed to divide Southdown into separate agricultural and manufacturing entities having generally different operating characteristics and capital requirements. To assess the wisdom of this plan, Southdown consulted two investment advisers, each of whom endorsed the proposed separation.

In 1973 and 1974 the board of directors authorized two attempts to divide Southdown into separate entities. These efforts were abandoned, however, when, on one occasion, a number of shareholders instituted lawsuits seeking to enjoin the separation and, on another occasion, the company encountered certain mechanical difficulties in accomplishing the separation. The search for ways to divide the company continued, and, on March 27, 1975, the board of directors unanimously approved the spin-off of Valhi from the parent corporation and announced in a press release its filing of a registration statement and accompanying prospectus with the SEC. On May 13, 1975, the spin-off was consummated when Southdown distributed the stock of Valhi as a dividend to Southdown's common shareholders.

The alleged secret attempts by Mize to gain control of Valhi occurred during the period immediately prior to and following the May 1975 spin-off. These events can conveniently be discussed as the (1) the Lambert tender offer proposal, (2) the Peterson deal, and (3) the Farnham countertender offer.

## The Lambert Tender Offer Proposal.

In November 1974 a New York representative of Lambert Freres et Cie., Inc. (Lambert), a French construction company, telephoned Mize in Houston, Texas. The representative informed Mize that Lambert had observed Southdown's previous unsuccessful attempts to spin off its Valhi subsidiary and suggested that Lambert might be able to assist Southdown in achieving that goal. After further discussion, Mize learned that Lambert was considering making a tender offer for Southdown stock. Lambert stated that it was primarily interested in Southdown's cement operations and had little or no interest in the company's farming operations or in the other businesses in which Southdown was engaged. Lambert then made clear that if the acquisition were accomplished it would be interested in selling Valhi in order to help finance the tender offer for Southdown. Aware that Mize had long been interested in working exclusively with Southdown's agricultural subsidiary, Lambert suggested that Mize form an investment group with Leland McCarthy and Richard McCarthy for the purpose of purchasing Valhi.[2] Mize expressed interest in this proposal.

---

**2.** Richard and Leland McCarthy were operating principals of Valhi and the owners of 17 percent of the company's stock. Southdown had previously announced that in the event of a

On January 23, 1975, Lambert forwarded to the Southdown board of directors a letter[3] proposing a tender offer for a majority of Southdown's common stock at a minimum price of $12 per share and its preferred stock at a minimum price of $25 per share. The letter stated that because Lambert had no interest in Valhi's agricultural operations it would, after gaining control of Southdown, distribute the Valhi stock on a pro rata basis to Southdown shareholders. The letter further stated that the tender offer proposal was "based on the understanding that Messrs. Mize, L. McCarthy and R. McCarthy would agree to purchase all shares of Valhi common stock to be owned by Lambert" at $10 per share.

On January 24, 1975, Southdown issued a press release notifying shareholders of the possibility of a cash tender offer for Southdown stock and stating that it intended to cooperate with the proposed offeror's efforts to conduct a financial review of the company. The press release emphasized the contingent nature of the tender offer, noting that the board of directors could give no assurances that the offeror would ultimately decide to proceed with its proposal or that the directors would be able to recommend the tender offer to shareholders. Unlike Lambert's January 23, 1975 letter, however, the press release made no mention of the proposed distribution of Valhi shares to Southdown shareholders or of the possible sale to Mize and the McCarthys of the Valhi shares Lambert would receive in the distribution.

*The Peterson Deal.*

During the early fall of 1974 and prior to the negotiations with Lambert, Charles Peterson, a former president of National Alfalfa Dehydrating & Milling Company (National Alfalfa),[4] expressed an interest in having Southdown or one of its subsidiaries purchase his 51 percent block of National Alfalfa stock. At that time Peterson's stock was pledged to secure a 4.5 million dollar loan which he had obtained from Crown Cork Financial. Peterson indicated that he wanted to sell his stock for an amount sufficient to repay his loan obligation and that he wanted an equity interest in the entity that ended up owning the National Alfalfa stock. Interested in this proposal, Southdown drafted a preliminary purchase agreement for Peterson's stock. In October 1974, however, negotiations were terminated because Southdown, in an unrelated transaction, was planning to file a registration statement with the SEC and lacked sufficient information about National Alfalfa to include in its registration materials. On several occasions during the winter of 1974–75 Mize reaffirmed Southdown's interest in National Alfalfa and indicated that future negotiations with Peterson might be possible.

On March 27, 1975, the day Southdown announced the spin-off of its agricultural subsidiary, Mize resigned as an officer and director of Southdown and became chairman of the board of directors and chief executive officer of Valhi. In early 1975 Mize prepared a memorandum entitled "Valhi/NA/CP" which outlined a proposal whereby Valhi would acquire 100 percent of the stock of National Alfalfa.[5] The memorandum provided that:

1. Valhi would issue preferred stock to Peterson in exchange for his National Alfalfa stock;

___

separation of Valhi from Southdown, the McCarthys and Mize intended to work for Valhi.

3. The Lambert letter was based on and virtually identical to a draft letter of intent which had been prepared by Southdown, under Mize's direction, and mailed to the Lambert representative.

4. National Alfalfa is a publicly-held company with assets consisting of irrigated corn land in Nebraska, Kansas, and Texas.

5. The acquisition by Valhi of Peterson's 51 percent block of National Alfalfa stock was the first step in a plan to acquire all of the stock of National Alfalfa. Following the purchase of Peterson's stock, Valhi was scheduled to make a cash tender offer for the balance of the National Alfalfa stock owned by persons other than Peterson or, alternatively, to merge Valhi and National Alfalfa.

2. Peterson would contribute the Valhi preferred stock to Farnham Corporation (a newly-formed company) in exchange for (a) $7,000,000 which he would use to pay off his loan secured by the National Alfalfa stock and (b) a 24.5 percent ownership interest in Farnham Corporation;

3. Mize and the McCarthys would transfer to Farnham Corporation approximately $2,250,000 in assets in exchange for which Mize would receive 26.5 percent ownership interest in Farnham and each of the McCarthys would receive 24.5 percent;

4. Farnham Corporation would borrow the $7,000,000 to be paid by Peterson by pledging as collateral the Valhi preferred stock which it would obtain from Peterson.

On April 15, 1975, Mize delivered the Valhi/NA/CP memorandum to Peterson. Peterson was interested in the Mize proposal and, at one point, indicated that he was willing to proceed with the deal if Mize could obtain the necessary financing. However, because he was anxious to pay off the loan encumbering his National Alfalfa stock, Peterson stated that he would continue in his efforts to sell the stock to persons other than Valhi.

On April 25, 1975, Mize and the McCarthys met with representatives of a California bank to inquire whether the bank would be willing to lend Farnham Corporation, upon its incorporation, $7,000,000 to be used by Peterson to pay off his loan to Crown Cork Financial. On May 13, 1975, officers of the bank advised Mize that the bank would approve the loan provided all other aspects of the proposal set forth in the Valhi/NA/CP memorandum were accomplished.

Although the negotiations with Peterson occurred contemporaneously with Southdown's efforts to spin off its Valhi subsidiary, neither the prospectus mailed to Southdown shareholders on April 18, 1975 nor any of its amendments made any mention of the deal proposed in the Mize memorandum. In May 1975 a number of Southdown shareholders instituted lawsuits seeking to enjoin the Valhi spin-off, and on May 15, 1975, the district court entered a temporary restraining order prohibiting the distribution of the Valhi shares as a dividend by Southdown.[6] Faced with this development, Mize concluded that the deal set forth in the Valhi/NA/CP memorandum was no longer viable, and he abandoned the idea altogether.

*The Farnham Counter-Tender Offer.*

In July 1975 Contram Corporation, a Dallas-based investment company, made a tender offer for Valhi stock. After learning of this development, Mize, L. McCarthy, and R. McCarthy formed Farnham Corporation for the purpose of making a counter-tender offer for Valhi. In connection with this attempt, Farnham filed a Schedule 13D statement with the SEC and mailed tender offer materials to the Valhi shareholders. None of Farnham's offering materials informed shareholders that Mize and the McCarthys had made previous unsuccessful attempts to gain control of Valhi.

On July 29, 1975, Contram filed a lawsuit in federal district court seeking to enjoin the Farnham tender offer. The district court issued the injunction, and, as a consequence, Contram was successful in acquiring 51 percent of Valhi.

After hearing the evidence, the district court held that the SEC had not proved that defendants had violated the federal securities laws nor established that there was a reasonable likelihood that defendants were about to engage in violations of those laws. The court characterized the Lambert and Peterson negotiations as mere "ideas" in the formulative stage which never reached a degree of maturity so as to require disclosure to the SEC or the investing public. The SEC contends that the court's holding strikes at the concept of "full disclosure" which stands at the heart of the federal securities laws and overlooks entirely the affirmative misstatements of fact

---

**6.** The temporary restraining order was dissolved on May 23, 1975, and on May 28, 1975, the Valhi stock was distributed to those persons who were Southdown shareholders as of the record date of the spin-off.

made by defendants. In addition, the SEC argues that the court applied an erroneous standard of materiality to the facts in this case.

## II.

The SEC is authorized to seek injunctive relief whenever it appears that a person is engaged in or "about to engage in" acts or practices which constitute a violation of the federal securities laws. Section 20(b) of the Securities Act of 1933, 15 U.S.C. § 77t(b); section 21(d) of the Securities Exchange Act of 1934, 15 U.S.C. § 78u(d). The district court is required to grant the requested injunction "upon a proper showing" by the SEC. *Id.* To satisfy the "proper showing" requirement in a case where current violations are not alleged, the SEC must establish that there is a reasonable likelihood that the defendant, if not enjoined, will engage in future violations of the securities laws. *SEC v. Blatt*, 583 F.2d 1325, 1334 (5th Cir. 1978); *SEC v. Commonwealth Securities, Inc.*, 574 F.2d 90, 99–100 (2d Cir. 1978). The decision to grant or deny injunctive relief will be reversed on appeal only if the district court abused its discretion or failed to apply the proper legal standard.

Although the SEC contends that defendants made several misstatements of fact, most of the alleged deficiencies in this case relate to Mize's failure to disclose the negotiations he had engaged in with Lambert and Peterson, negotiations which the SEC contends were material facts under the federal securities laws. Materiality requires "a showing of a substantial likelihood that, under all the circumstances, the omitted fact would have assumed actual significance in the deliberations of the reasonable shareholder." *TSC Industries, Inc. v. Northway, Inc.*, 426 U.S. 438, 449, 96 S.Ct. 2126, 2132, 48 L.Ed.2d 757 (1976).

It is clear that some facts are deemed material even though they refer to a prospective and, therefore, contingent event "provided there appears to be a reasonable likelihood of its future occurrence." *Sonesta International Hotels Corp. v. Wellington*

*Associates*, 483 F.2d 247 (2d Cir. 1973). In the landmark case of *SEC v. Texas Gulf Sulphur Co.*, 401 F.2d 833 (2d Cir. 1968), *cert. denied*, 394 U.S. 976, 89 S.Ct. 1454, 22 L.Ed.2d 756 (1969), the Second Circuit formulated the standard of materiality to be applied in such cases:

> [M]aterial facts include not only information disclosing the earnings and distributions of a company but also those facts which affect the probable future of the company and those which may affect the desire of investors to buy, sell, or hold the company's securities.
>
> In each case, then, whether facts are material within Rule 10b–5 when the facts relate to a particular event and are undisclosed by those persons who are knowledgeable thereof will depend at any given time upon *a balancing of both the indicated probability that the event will occur and the anticipated magnitude of the event in light of the totality of the company activity.*

*Id.* at 849 (emphasis added). *See also Harkavy v. Apparel Industries, Inc.*, 571 F.2d 737, 741 (2d Cir. 1978); *SEC v. Shapiro*, 494 F.2d 1301, 1305–06 (2d Cir. 1974); *Sonesta International Hotels Corp. v. Wellington Associates, supra*, 483 F.2d at 251; *Chris-Craft Industries, Inc. v. Piper Aircraft Corp.*, 480 F.2d 341, 368 (2d Cir. 1973); *cert. denied*, 414 U.S. 910, 94 S.Ct. 231, 232, 38 L.Ed.2d 148 (1974).

## III.

The SEC argues that the press release issued during the Lambert tender offer negotiations was false and misleading because it failed to disclose Lambert's intention to distribute Valhi to Southdown's shareholders and to sell the Valhi stock it acquired in the distribution to Mize and the McCarthys.

The January 24, 1975 press release was disseminated the day after the board of directors received the letter from Lambert setting forth the proposed tender offer for Southdown. The press release announced that a "foreign entity" was considering making a tender offer for Southdown and

informed investors that the directors intended to cooperate in a financial review of the company. The release gave a brief description of the terms and conditions of the offer, including the projected per share prices referred to in the Lambert letter, but omitted the information contained in paragraphs five and six of that letter. These paragraphs stated in part:

> Fifth, we have concluded from a preliminary review of Southdown and its subsidiaries that the continued operation by Southdown of the agricultural and land development businesses presently being conducted by it through its wholly-owned subsidiary, [Valhi], would be inconsistent with the plans and policies which we would seek to adopt and implement following the tender offer. Accordingly, as promptly as practicable following a successful tender offer, it would be our intention to cause the management of Southdown to submit to the board of directors of Southdown . . . a proposal to distribute to the holders of Southdown common stock all 1,096,812 shares of common stock of Valhi. . . . Sixth, Lambert is not interested in investing in agricultural and land development operations, and continuity of management is essential to disposal of these interests following the successful completion of the tender offer. Therefore, the approach set forth in this letter is based on the understanding that Messrs. Mize, L. McCarthy and R. McCarthy would agree to purchase all shares of Valhi common stock to be owned by Lambert following the stock distribution referred to in paragraph fifth above for $10 per share. . . .

The district court found that the Lambert proposal was not "a plan but only an idea" and that the matters discussed in these paragraphs did not constitute material facts.

The SEC lists a number of reasons why the undisclosed information would have been important to the reasonable investor. First, the SEC points out that Lambert was interested in selling its Valhi stock in order to help finance the purchase of Southdown stock. It then argues that disclosure of Lambert's need for additional cash to finance a tender offer would have caused some investors to conclude that the tender offer would not succeed and, therefore, would have affected their investment decisions. Second, the SEC contends that disclosure of the information would have provided investors with an indication of Lambert's future intentions regarding a valuable subsidiary. Finally, the SEC argues that disclosure would have alerted investors to a possible conflict of interest arising from Mize's dual role as a negotiator for Southdown interested in the highest price for Southdown shares, and as a negotiator for himself interested in acquiring Lambert's Valhi shares at the lowest possible cost.

The defendants respond by characterizing the proposed Valhi spin-off and consequent sale of Lambert's Valhi shares to the Mize group as too speculative and "iffy" a proposition to be discussed in a press release. In one sense, the undisclosed information was no "iffier" than those aspects of the Lambert proposal which were included in the press release. The letter from Lambert suggested a tentative "approach" for accomplishing the proposed tender offer, and the press release emphasized that the Southdown board could give no assurances that "any cash tender offer ultimately would be made by such offeror or, if made, that the final terms and conditions of such offer would be satisfactory to Southdown and its security holders." Clearly, the conditional nature of the tender offer infected the whole proposal and not just the contents of paragraphs five and six. Conversely, paragraphs five and six contain no language suggesting that this aspect of the proposal was subject to certain special conditions which did not apply to the tender offer as a whole.[7] It is at least arguable,

7. The paragraphs state that "*it would be our intention* to cause the management of South-

down to submit to the board of directors" a proposal to spin off Valhi, and that "the ap-

therefore, that the Valhi spin-off and the purchase by Mize of Lambert's Valhi shares were no less certain to occur than the other aspects of the tender offer proposal.

In another sense, however, the proposition set forth in paragraphs five and six of the Lambert letter was less likely to occur than the tender offer itself. Lambert's principal reason for proposing a tender offer was its interest in acquiring Southdown's cement operations. Aware that Southdown had been searching for a way to spin off its Valhi subsidiary, Lambert proposed a plan whereby it could acquire the desired cement interests and, in the process, Southdown could divide itself into separate entities. Obviously, the mutually beneficial aspects of this proposal were designed to make the tender offer attractive to Southdown and did not reflect a disinterested desire to help Southdown achieve its objective. Therefore, a decision by Southdown not to cooperate with Lambert's bid for control of the company would not necessarily have dissuaded Lambert, provided it secured adequate financing,[8] from tendering for Southdown stock. Furthermore, at the time the press release was issued the discussions with Lambert were in the negotiation stage and had not culminated in an agreement to proceed with the proposal outlined in the Lambert letter. It was entirely possible that, after further study, the Southdown board would find the tender offer proposal unacceptable and decide to resist Lambert's efforts to acquire Southdown.

The record indicates that Southdown issued the press release out of fear that someone from Lambert, a company over which Southdown had no control, would fail to maintain the confidentiality of the tender offer negotiations. In order to forestall the misuse of this material inside information, Southdown determined that it

was "imperative . . . to make some public disclosure of the essence of what was being discussed." Once this decision was made, the Southdown board was presented with the more difficult task of selecting the information to be included in its press release. On advice of counsel, the board, with Mize abstaining, decided to state only that there was a remote possibility of a tender offer for Southdown stock. The district court agreed with the decision of Southdown's counsel that the likelihood of the occurrence of the proposition set forth in paragraphs five and six was not sufficiently appreciable to require disclosure of this information. We are unwilling to disturb this finding.

The Supreme Court has admonished reviewing courts that the determination of materiality "requires delicate assessments of the inferences a 'reasonable shareholder' would draw from a given set of facts and the significance of those inferences to him, and these assessments are peculiarly ones for the trier of fact." *TSC Industries, Inc. v. Northway, Inc., supra*, 426 U.S. at 450, 96 S.Ct. at 2133. After reviewing all the facts and circumstances in this case, we hold that the district court did not err in concluding that the press release was not false and misleading because it failed to include the contents of paragraphs five and six of the Lambert letter. As this court has observed elsewhere, we do not imply that the undisclosed information was not of sufficient importance to support a finding of materiality. "Clearly it was. We hold only that the question of the materiality of the [information] was within the legitimate province of the jury." *Smallwood v. Pearl Brewing Co.*, 489 F.2d 579, 604-05 (5th Cir.), *cert. denied*, 419 U.S. 873, 95 S.Ct. 134, 42 L.Ed.2d 113 (1974).

proach set forth in this letter *is based on the understanding* that Messrs. Mize. L. McCarthy and R. McCarthy *would agree* to purchase all shares of Valhi to be owned by Lambert following the stock distribution." (emphasis added.)

8. The evidence indicates that the funds Lambert would receive from the sale of the Valhi shares it received in the proposed stock distri-

bution were needed to finance, at least in part, Lambert's tender offer for Southdown. However, nothing in the record indicates that the sale of its Valhi shares to Mize and the McCarthys was the only possible means of financing available to Lambert. Had Lambert secured funds from other sources, the need to sell its Valhi shares would never have arisen.

According to the SEC, the Peterson deal involved the most egregious violations of the federal securities laws and best illustrates Mize's surreptitious attempts to gain control of Valhi. Essentially, the SEC argues that the registration statement and prospectus prepared in connection with Southdown's decision to spin off Valhi were materially false and misleading because (1) they *omitted* any mention of the Valhi/NA/CP memorandum drafted by Mize and (2) they *affirmatively misstated* that there were no plans to issue preferred stock or to declare cash dividends, that earnings would be retained to finance expansion and development, and the reasons for the Valhi spin-off.

During the interim between March 27, 1975, when Southdown announced the Valhi spin-off and its filing of a registration statement and prospectus with the SEC, and May 13, 1975, the record date of the stock distribution to Southdown shareholders, Mize developed the proposal which he incorporated in the 27-page Valhi/NA/CP memorandum. This proposal, delivered to Peterson on April 15, 1975, involved a complex series of transactions which culminated in the creation of a new company owning 520,000 shares of newly-issued Valhi preferred stock. The stock of the new company, Farnham Corporation, was to be owned jointly by Mize, Peterson, and the McCarthys. The district court concluded that the Mize proposal involved mere "ideas" which had not reached a stage of maturity where disclosure was required.

Initially, it is clear that the "anticipated magnitude" element of the *Texas Gulf Sulphur* test, when applied to these facts, militates in favor of disclosure of the Peterson negotiations. The decision by Southdown to spin off Valhi was a major event in the life of both corporations. Shareholders and investors faced with this development would naturally be concerned about the capital and dividend structure of the spun-off corporation. Moreover, an agreement between certain corporate insiders and a third party to gain a controlling interest in Valhi would have been an important consideration to shareholders trying to decide whether to buy, sell, or hold Southdown securities. Because the significance of the event to the corporation is established, the critical questions with respect to the Peterson deal relates to the likelihood or "indicated probability" that the Mize proposal would be effectuated. After a careful consideration of the record and with due deference to the district court's finding, we believe the balance in this case tips in favor of materiality.

In assessing the probability of the completion of the Peterson deal, we think it highly significant that the two principal hurdles in the Mize proposal, i. e., convincing Peterson of the merits of the deal and obtaining the necessary bank financing, had been successfully surmounted prior to the record date of the Valhi spin-off. Shortly after he received a copy of the Valhi/NA/CP memorandum on April 15, 1975, Peterson informed Mize that he believed that the suggested approach was acceptable and that he was prepared to go forward with the deal if Mize could secure the necessary financing. Mize immediately set out to accomplish this goal. Following initial negotiations between the Mize group and representatives of a Fresno, California Bank concerning the possibility of a $7,000,-000 loan to Farnham Corporation, on May 6, 1975, the bank representatives prepared a written loan report which concluded with the statement, "Approval is highly recommended." On May 13, 1975, the president, the principal loan officer, and the chief administrative officer of the bank informed Mize that the bank would be willing to make the loan if the other aspects of the Valhi/NA/CP proposal were accomplished. Although these developments occurred during the sensitive period following the dissemination of the prospectus describing the Valhi spin-off, Mize made no efforts to disclose the terms of the Valhi/NA/CP memorandum.

■ It is true, as the defendants point out, that other steps had to be taken before the Mize proposal could be finalized in an "agreement." However, a proposal need

not be final or consummated in order to be relevant to shareholder decisionmaking. Where the occurrence of a proposed course of action has reached a stage of probability rather than mere possibility, the negotiations concerning the proposed action must be disclosed even though the future event is not absolutely certain to occur. In this case the uncompleted aspects of the Valhi/NA/CP proposal did not present a significant obstacle to the realization of the Peterson deal. As Mize testified at trial, the deal would have succeeded if the shareholder suits to enjoin the Valhi spin-off had not been filed:

Q  As far as your particular Peterson deal would have gone through had it not been for the lawsuits in connection with the spinoff?

A  We terminated the Peterson deal without ever going to the lawyers because of a TRO being issued in the litigation.

Q  Well, answer the question, please.

MR. HALL: I believe he did.

MR. BRODSKY: I asked him a yes or no question. I didn't say what caused the deal to be cut off. I'll ask the question again.

Q  (By Mr. Brodsky) It would have gone through again had it not been for the lawsuits in this connection?

A  *I believe it would have gone through.*

Emphasis added.

In conclusion, we are convinced that during the period immediately prior to the scheduled Valhi spin-off, the proposal incorporated in the Valhi/NA/CP memorandum had a very good chance of succeeding. We therefore hold that the failure to disclose this information or to amend certain statements in the registration statement and prospectus made these documents false and misleading. We also hold that the tender offer materials prepared by Farnham Corporation in connection with its counter-tender offer for Valhi should have disclosed that Mize, the McCarthys, and Peterson had made a previous unsuccessful attempt to gain control of Valhi.

In reviewing the district court's decision in this case, we have carefully considered the SEC's argument that the court failed to apply the accepted standard of materiality. We see no evidence in the record to support this contention. The court determined that the negotiations Mize engaged in with Lambert and Peterson had not reached a stage of development or maturity so as to require disclosure. The basis for this finding was the implied assumption that the omitted information would not have been important in the deliberations of the reasonable shareholder. Thus, although we disagree with the district court's conclusions regarding the Peterson deal, we do not believe the court applied an erroneous legal standard to the facts in this case.

IV.

The SEC brought this action to enjoin defendants from engaging in future violations of the federal securities laws. In order to obtain the requested injunctive relief, the SEC has the burden of showing that there exists a reasonable likelihood that violations will occur in the future. To prove this likelihood, "[t]he Commission needs to go beyond the mere fact of past violations." *SEC v. Blatt*, 583 F.2d 1325, 1334 (5th Cir. 1978). Although we have found that the defendants did engage in past violations of the federal securities laws, we have not considered the question of whether these defendants are likely to engage in *future* violations. For this reason, we remand this case to the district court for further consideration. On remand, the district court should reconsider its finding of no reasonable likelihood of future violations in the light of our determination that past violations did occur.

REVERSED IN PART and REMANDED.