**SECURITIES AND EXCHANGE COMMISSION, Plaintiff,**

v.

**N. Rountree YOUMANS, John Vorder Bruegge, Thomas Wendell Holliday, Richard A. Chepul, Defendants.**

**No. CIV–1–79–216.**

United States District Court,
E. D. Tennessee, S. D.

July 23, 1982.

Barton Sacher, Mark A. Lieberman, S. E. C., Atlanta, Ga., for plaintiff.

Edgar H. Sims, Jr., Kutak, Rock & Huie, Atlanta, Ga., for Neal Rountree Youmans.

James W. Gentry, Jr., Chattanooga, Tenn., for T. Wendell Holliday & Richard A. Chepul.

Charles W. Lusk, Hall, Haynes, Lusk & Foster, Chattanooga, Tenn., for John Vorder Bruegge.

### FINDINGS OF FACT AND CONCLUSIONS OF LAW

FRANK W. WILSON, Chief Judge.

This is an action by the Securities and Exchange Commission (SEC) against certain former directors and officers of Hamilton Bancshares, Inc. (HBI) in which the SEC seeks a permanent injunction restraining and enjoining the defendants from committing future violations of the Securities Act of 1933, 15 U.S.C. §§ 77a *et seq.* (Securities Act) or of the Securities Exchange Act of 1934, 15 U.S.C. §§ 78a *et seq.* (Exchange Act). Jurisdiction is invoked pursuant to 15 U.S.C. §§ 77t(b) and 15 U.S.C. § 78u(d) and (e) and is not in dispute. Prior to trial of the case a consent decree was entered as to the defendants Youmans and Vorder Bruegge. The case was tried before the Court sitting without a jury as to the defendants Holliday and Chepul. The case is presently before the Court upon the record made at the trial of the lawsuit. The Court enters the following findings of fact and conclusions of law on the basis of the full record made in the course of the trial of the lawsuit.

### *Findings of Fact*

(1) On and prior to February 16, 1976, Hamilton Bancshares, Inc. (HBI) was a Tennessee bank holding company having its principal offices in Chattanooga, Tennessee. During its existence HBI was registered

with the SEC pursuant to Section 12(g) of the Securities and Exchange Act of 1934. Its common stock was publicly traded over-the-counter and quoted on the National Association of Securities Dealers Automated Quotations System ("NASDAQS"). In addition, HBI common stock was sold to employees of HBI and its affiliated companies during 1974 and 1975.

(2) In its capacity as a holding company, HBI owned all or substantially all of the capital stock in 17 banking corporations, including the Hamilton National Bank (HNB), and eight bank servicing corporations and other financial institutions, including the Hamilton Mortgage Corporation (HMC). HNB was a national bank with principal offices in Chattanooga, Tennessee. HMC was a wholly owned non-banking subsidiary of HBI engaged in the mortgage loan business in the Atlanta, Georgia area.

(3) Although the origins of Hamilton Bancshares, Inc. and Hamilton National Bank, as well as other subsidiary or affiliated corporations, relate back a number of years, the issues in this lawsuit are confined to the period between 1972 and 1976, and, in particular, to the relationship and activities of Hamilton Bancshares, Inc., Hamilton National Bank and Hamilton Mortgage Corporation during that period.

(4) During the period from 1972 to 1975 the defendant, Thomas Wendell Holliday (Holliday), was Executive Vice President of HBI and served as a director and a member of the Executive Committee of that corporation. In March of 1975 Holliday became President of HBI and continued in that capacity until the initiation of the bankruptcy proceedings by HBI in 1976. During the period from 1972 to the bankruptcy of HBI in February of 1976, Holliday was charged with primary responsibility for drafting and filing HBI's reports with the SEC, including annual (form 10K), quarterly (form 10Q) and monthly (form 8K) reports and proxy soliciting materials. Since the termination of his relationship with HBI following its bankruptcy in 1976, Holliday has become associated with an entity known as C & C Capital Corporation, with offices located in Knoxville, Tennessee. In this capacity Holliday is responsible for advising banks and financial institutions on management and investment matters. It does not appear that since the termination of his employment with HBI in 1976 he has engaged in an activity that involved the making or filing of reports pursuant to the Securities Act of 1933 or the Securities and Exchange Act of 1934.

(5) During the period from 1972 until 1976 Richard A. Chepul (Chepul) was Vice President and Secretary-Treasurer of HBI. In this capacity he served as a chief financial officer of HBI. His immediate supervisor was Holliday. In his capacity as chief financial officer of HBI, Chepul was assigned the responsibility by Holliday for drafting and filing HBI's reports with the SEC after such reports were first reviewed by Holliday. Although not a director of HBI, as the Secretary-Treasurer of HBI, Chepul was present at most of the Board of Directors meetings and Executive Committee meetings of HBI. During the period from 1972 to 1976 Chepul also served as a director on the Board of HMC. Since leaving HBI following its bankruptcy in 1976, Chepul has assumed the position of Vice President and Comptroller of United Carolina Bancshares, Inc., a bank holding company whose stock is publicly traded. In this capacity Chepul is responsible for filing all reports which are required to be filed with the SEC. It appears that at the time of the trial (1981) he was engaged in duties and activities substantially the same as those which he performed with HBI.

(6) On February 16, 1976, the United States Comptroller of Currency declared HNB to be insolvent and placed it in receivership. At the time HNB was placed in receivership it had assets of some $417,000,-000 and its failure was the third largest bank failure in the history of the Nation. It was by far the largest subsidiary of HBI and its failure resulted in HBI filing for bankruptcy upon February 20, 1976. The issues in this lawsuit relate to the circumstances giving rise to the bankruptcy of HBI, the knowledge and participation of

the defendants Holliday and Chepul in those circumstances, and the disclosures or lack of disclosures made in SEC reports with regard to those circumstances.

(7) One of the principal areas of alleged misrepresentation and nondisclosure which the defendants are charged with by the SEC relates to the making and processing of mortgage loans originated by HMC and participated in by HNB. In regard to these matters the evidence appears to preponderate in favor of a finding of the following facts. In November of 1972 HBI formed HMC, a wholly owned subsidiary, in order to enter into the mortgage loan business in the Atlanta, Georgia area, an area then believed to be particularly promising for the making of real estate loans. As financial officers of HBI, one of the principal responsibilities of both Holliday and Chepul was the supervision of the funding of the operations of HMC. During the period from 1972 to 1976 HBI funded the operations of HMC by three principal methods. One method was the sale of commercial paper to outside financial institutions. A second method was borrowing from outside banks. The third method was the sale of participations in HMC loans, such loan participations having been sold primarily to HBI's principal subsidiary bank, HNB.

(8) Prior to the formation of HMC in 1972, and for a few months after its formation, the decision by HNB to purchase participations in loans originating with other financial institutions was subject to a creditworthiness review of the underlying loan. By the latter part of 1973 the established procedures for reviewing loans originated by HMC and submitted for purchase by HNB had been largely abandoned and such loans were being purchased by the Bank with little regard for the creditworthiness of the original borrower or the adequacy of the collateral.

(9) Other irregularities in the purchase by HNB of loan participations from HMC developed, including the purchase of individual loans in excess of loan limits, the purchase of loans without adequate documentation, and the practice of permitting HMC to make regular and large overdrafts on its account at HNB (See Ex. # 34).

(10) Both Holliday and Chepul were fully aware of each of the irregularities recited in paragraphs (8) and (9) above. Notwithstanding discussions in October of 1973 with bank examiners with regard to these irregularities and with regard to violations of federal banking laws and regulations, both Holliday and Chepul made no disclosure of these matters in any report to the SEC, nor did they assert meaningful efforts to secure a discontinuance of the practices.

(11) By the end of 1973, and within approximately one year from its organization, HMC had committed to loans in excess of $230,000,000. Many irregularities occurred in the making of these loans. It appears that many loans for the acquisition and development of real estate were made with the borrower having no equity in the development and without proper appraisals. In 1974 the Atlanta real estate market became depressed as a result of a nationwide recession in that year. As a combined result of the recession and the aggressive and irregular loan practices of HMC, more than $27,-000,000 of HMC's loans were in past due status by September of 1974.

(12) In purchasing participations in loans originated by HMC, HNB purchased 99.9% of the face amount of the loan, leaving HMC sharing in the loan only to the extent of one-tenth of one per cent. By the end of 1974 over 40% of HNB's loan portfolio was invested in loan participations originated by HMC. During this period of time, interest payments on some $15,000,000 in loans participated to HNB became delinquent. HMC made these interest payments to HNB without collecting from the original borrower and the Bank then inaccurately recorded the loans as being current when in fact they were delinquent.

(13) Prior to July of 1974 Moody's Commercial Paper Service, a national commercial paper rating service, had rated HBI's commercial paper as P–2, signifying that it was of medium high quality. As a result of the examination of various aspects of HBI's financial operations, Moody's advised HBI

on July 1, 1974 that it would no longer rate HBI's commercial paper. The effect of this was to eliminate a national market for sales of such paper and to very substantially impair HBI's ability to fund HMC's operations. It also resulted in HNB increasing its purchase of HMC's loans. These matters were not disclosed in HBI's reports to the SEC.

(14) In September of 1974 the Comptroller of the Currency undertook one of its annual audits of HNB. The report as finally written was highly critical of HNB (Ex. # 82). It listed approximately $54,000,000 in classified loans, over 80% of which were loan participations originated by HMC. The report was critical of the speculative nature of the HMC loans participated into the Bank, of the lack of proper documentation of the loans, of the poor management of the Bank, of domination of the Bank by HBI and of the reworking of loans to cover delinquencies in interest. Although it appears that most if not all of these conditions were either known or should have been known to HBI officials, including the defendants Holliday and Chepul, from sources other than the examiner's report, the conditions were not reported in any of the SEC filings made by those officials. The reason given for not making the disclosures was that the Comptroller's report was classified as "Confidential", thereby prohibiting disclosure of the conditions described in the report. As hereinafter noted, in December of 1974 disclosure of the information in the Comptroller's report was made to the New York line banks with which HBI had established a line of credit.

(15) As a result of the criticism contained in the Comptroller's September 30, 1974 report (Ex. # 82), on December 18, 1974 HNB entered into a written agreement with the Comptroller that it would purchase no further loan participations from HMC without express approval of the Comptroller (Ex. # 74). However, on the following day, December 19, 1974, HNB purchased an additional $2,500,000 in HMC participations without obtaining approval of the Comptroller, giving as an explanation for its actions that the additional loans were being processed at the time of the December 18, 1974 agreement.

(16) HBI filed an 8–K for the month of December 1974 increasing its provisions for loan losses by $4,500,000 to a total of $15,-000,000. The reason stated in the report for the increase in the reserve was as follows:

> "It is management's practice to conduct a continuous credit review of the loan portfolios of all Bancshares' subsidiaries, banking and nonbanking. A determination of the adequacy of the reserve for possible loan losses is based on this review and in light of the past loss experience factors, of current economic conditions, of changes in the character of the loan portfolio and other pertinent indicators.

> "These supplemental provisions for loan losses were provided in view of adverse economic conditions encountered in 1974 and continued adverse economic circumstances faced by the two subsidiary borrowers."

In light of the circumstances at the time, this statement appears to have been misleading. The actual facts showed, and the defendants knew, that management made no "continuous credit review". In fact, HNB did not even make the review of the creditworthiness of its borrowers as required by federal banking laws. Moreover, it appears that the loan loss reserve was actually reviewed at the insistence of the Comptroller of the Currency.

(17) In 1973 and 1974 a principal source of credit available to HBI was through lines of credit obtained from money center banks in New York and Chicago. As early as August of 1974 Holliday and Chepul were advised by the Chicago bank, Continental Bank of Illinois, that it was dissatisfied with HBI's financial operations and was curtailing its line of credit. Subsequently in March of 1975 Continental withdrew all credit to HBI.

(18) In December of 1974 the New York line banks, upon learning of the criticisms made in the Comptroller's September 30, 1974 report, froze their lines of credit to HBI. As a result of this action, HBI grant-

ed the New York banks significant controls over the operations of HBI, including control over the sale or transfer of assets, and control over loans made by HMC. In March of 1975 the New York banks negotiated a "Revolving Credit Agreement" with HBI. This agreement provided for a $20,-000,000 line of credit, but required that $15,000,000 of this line be used to pay existing creditors of HBI. In addition, it placed in the New York banks extensive controls over the operations of HBI.

(20) In the March 1975 8–K report filed with the SEC, a copy of the Revolving Credit Agreement was attached, but the problems encountered with the Chicago and New York line banks were not otherwise adequately disclosed.

(21) In September of 1975 Holliday prepared an analysis of projected losses on HMC loans for presentation to the New York line banks. This analysis indicated that if HBI were forced to liquidate HMC's loan portfolio as of that time, out of a total of $71,000,000 in loans outstanding, HMC's projected losses were $46,000,000. If the New York banks would grant a five-year work out period, Holliday estimated that the losses could be reduced to $14,000,000 with a net recovery of $57,000,000 being effected (Ex. # 130). As testified to by Holliday, at this point in time he did not know what to report to the SEC, so that he reported nothing for fear of causing a run on HNB.

(22) In 1974 HBI, through one of its directors, acquired indirect control over the Georgia Savings Bank in Atlanta, Georgia. The name of the Georgia bank was then changed to Hamilton Bank & Trust Company (HBTC). In the latter part of 1974, and subsequent to the Comptroller's critical report of September 30, 1974, HBI negotiated an agreement with HBTC whereby HBTC would purchase participation loans from HMC. It was further a part of the agreement that HBI would cause its affiliated banks to purchase certificates of deposit from HBTC in amounts equal to the total participations purchased by HBTC and that HBI would agree to repurchase all partici-pations purchased by HBTC upon demand. In negotiating this transaction neither Holliday nor Chepul, who participated in the negotiations, disclosed to HBTC the grave financial problems of HBI, including the large volume of classified loans in the HMC portfolio and including the fact that HNB was forbidden to purchase such participations by its December 1974 agreement with the Comptroller. When the Georgia Commissioner of Banking learned of HBTC's acquisition of participations in HMC loans, he ordered HBTC to divest itself of the participations. Upon demand by HBTC, HBI then repurchased the loans. Thereupon the C of D funds deposited in HBTC by HBI affiliates were withdrawn. HBI failed to disclose in its reports filed with the SEC the existence of its buy-back agreement with HBTC, which buy-back agreement had the effect of rendering HBI's December 31, 1974 balance sheet misleading.

(23) Chepul drafted and Holliday reviewed all of the documents filed with the SEC from 1972 until HBI filed its bankruptcy petition in February of 1976. Chepul also drafted and Holliday reviewed the footnote to the financial statements that were attached to the reports filed with the SEC. Chepul participated in the preparation of the Proxy solicitation materials included in the annual notice of stockholders' meetings during the period from 1972 thru 1975, the last such report issued before bankruptcy having been issued under date of May 14, 1975 (Ex. # 62). Holliday reviewed the proxy statements prior to their issuance. At the time of the May 14, 1975 proxy statement none of the adverse matters described in paragraphs (12) thru (20) above was disclosed.

## Conclusions of Law

(24) The Court has subject matter jurisdiction over this lawsuit pursuant to Section 22 of the Securities Act [15 U.S.C. § 77v] and Section 27 of the Exchange Act [15 U.S.C. § 78aa]. The Court has personal jurisdiction over the parties and venue is proper in the Eastern District of Tennessee.

(25) Pursuant to Section 20 of the Securities Act [15 U.S.C. § 77t] and Section 21 of the Exchange Act [15 U.S.C. § 78u], the SEC is empowered to seek and the Court is empowered to issue writs of mandamus and injunctions commanding persons to comply with the Securities and Exchange Acts as well as the rules and regulations promulgated thereunder.

(26) Section 17(a) of the Securities Act provides:

"It shall be unlawful for any person in the offer or sale of any securities by the use of any means or instruments of transportation or communication in interstate commerce or by the use of the mails, directly or indirectly—

"(1) to employ any device, scheme, or artifice to defraud, or

"(2) to obtain money or property by means of any untrue statement of a material fact or any omission to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or

"(3) to engage in any transaction, practice, or course of business which operates or would operate as a fraud or deceit upon the purchaser."

(27) Pursuant to the requirements of Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)], HBI made "offers and sales" of securities in interstate commerce on a daily basis during the period from 1973 to 1976. Also during this period HBI offered and sold its common stock through its Employee Stock Ownership Plan.

(28) As the officers in HBI who were responsible for preparing, reviewing, and filing SEC reports, Holliday and Chepul were each primary participants in the deceptions caused by the nondisclosures indicated by the Court in the above findings of fact. As primary participants, they had sufficient direct contacts with the securities transactions of HBI to be personally responsible for the Securities Act violations. *SEC v. Coffey*, 493 F.2d 1304, 1315 (6th Cir. 1974).

(29) As primary participants during this period, Holliday and Chepul failed to disclose material matters that would constitute the kind of information to which there is a substantial likelihood a reasonable investor would attach significance in making his investment decisions. *SEC v. Mize*, 615 F.2d 1046, 1051 (5th Cir. 1980), *TSC Industries, Inc. v. Northway, Inc.*, 426 U.S. 438, 96 S.Ct. 2126, 48 L.Ed.2d 757 (1976).

(30) In this regard it is to be noted that proof of violation of Section 17(a)(2) & (3) of the Securities Act does not require scienter. *Aaron v. SEC*, 446 U.S. 680, 100 S.Ct. 1945, 64 L.Ed.2d 611 (1980). The Court is of the opinion that the defendants violated Section 17(a)(2) & (3) of the Securities Act by failing to disclose material facts as set forth in the Court's findings of fact. The omission of material facts by the defendants enabled HBI to obtain money for its securities in a manner which operated as a fraud or deceit upon the purchasers of those securities.

(31) Under Section 17(a)(1) of the Securities Act, scienter is a necessary element of the offense. *Aaron v. SEC*, 446 U.S. 680, 100 S.Ct. 1945, 64 L.Ed.2d 611 (1980). "Device", "scheme", and "artifice" all connote knowing and intentional practices and scienter refers to the intent to deceive, manipulate or defraud. *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 96 S.Ct. 1375, 47 L.Ed.2d 668 (1976).

(32) The Sixth Circuit has held that recklessness is a sufficiently culpable state of mind to fulfill the scienter requirement of § 10(b) and Rule 10b–5 [15 U.S.C. § 78j(b) and 17 C.F.R. § 240.10b–5] which is also the requirement of § 17(a)(1). Such recklessness is defined as "highly unreasonable conduct which is an extreme departure from the standards of ordinary care. While the danger need not be known, it must at least be so obvious that any reasonable man would have known it." *Mansbach v. Prescott, Ball & Turben*, 598 F.2d 1017, 1025 (6th Cir. 1979). Neither *Aaron* nor *Hochfelder* passed upon whether or not scienter required actual wilfulness or only recklessness, so the Sixth Circuit definition is controlling.

■ (33) The Court is of the opinion that, while the evidence does not establish an actual intent on the part of either defendant to defraud purchasers of HBI securities, the cumulative effect of the many nondisclosures reflected in the record of this case on the part of each of the defendants is such as to indicate a reckless disregard of the consequences of their action. The Court is further of the opinion that this reckless disregard was so unreasonable in the face of the obvious requirements of SEC filings as to constitute a violation on the part of both Holliday and Chepul of Section 17(a)(1).

(34) Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] provides:

"It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce or of the mails, or of any facility of any national securities exchange—

\*     \*     \*     \*     \*     \*

"(b) To use or employ, in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered, any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors."

(35) Rule 10b–5, 17 C.F.R. § 240.10b–5 promulgated under the statute provides:

"It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange,

"(a) To employ any device, scheme, or artifice to defraud,

"(b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or

"(c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security."

■ (36) Scienter is a requirement under Section 10(b) and Rule 10b–5. *Aaron v. SEC*, 446 U.S. 680, 100 S.Ct. 1945, 64 L.Ed.2d 611 (1980). Section 10(b) refers to a "purchase or sale" rather than an "offer or sale" as in Section 17(a) and thus reaches a broader range of activities. Rule 10b–5 is nearly identical to Section 17(a).

■ (37) The Court is of the opinion that the same facts which constituted violations of Section 17(a) of the Securities Act at paragraphs (26) thru (33) also support the finding of violations of Section 10(b) and Rule 10b–5.

(38) In relevant part Section 13(a) of the Exchange Act [15 U.S.C. § 78m(a)] provides:

"(a) Every issuer of a security registered pursuant to section 78*l* [Section 12 of Exchange Act] of this title shall file with the Commission, in accordance with such rules and regulations as the Commission may prescribe as necessary or appropriate for the proper protection of investors and to insure fair dealing in the security—

"(1) such information and documents (and such copies thereof) as the Commission shall require to keep reasonably current the information and documents required to be included in or filed with an application or registration statement filed pursuant to section 78*l* of this title, except that the Commission may not require the filing of any material contract wholly executed before July 1, 1962.

"(2) such annual reports (and such copies thereof), certified if required by the rules and regulations of the Commission by independent public accountants, and such quarterly reports (and such copies thereof), as the Commission may prescribe. Every issuer of a security registered on a national securities exchange shall also file a duplicate original of such information, documents, and reports with the exchange."

(39) Rule 12b pertains to registration and reporting pursuant to Section 13 and Rule 12b–20 [17 C.F.R. § 240.12b–20] states:

"In addition to the information expressly required to be included in a statement or report, there shall be added such further material information, if any, as may be necessary to make the required statements, in the light of the circumstances under which they are made, not misleading."

(40) Rule 13a–1 [17 C.F.R. § 240.13a–1] requires:

"Every issuer having securities registered pursuant to section 12 of the Act shall file an annual report on the appropriate form authorized or prescribed therefor for each fiscal year after the last full fiscal year for which financial statements were filed in its registration statement. Registrants on Form 8–B, § 249.308b of this chapter, shall file an annual report for each fiscal year beginning on or after the date as of which the succession occurred. Annual reports shall be filed within the period specified in the appropriate form. At the time of filing the annual report, the registrant other than a person registered under the Public Utility Holding Company Act of 1935 or the Investment Company Act of 1940 shall pay to the Commission a fee of $250, no part of which shall be refunded."

(41) Rule 13a–11 [17 C.F.R. § 240.13a–11] requires registrants subject to Rule 13a–1 to file current reports on Form 8–K unless the information required has been previously reported.

(42) Rule 13a–13 [17 C.F.R. § 240.13a–13] requires registrants who are required to file annual reports pursuant to section 12 on Form 10–K or U5S to file quarterly reports on Form 10–Q for the first three fiscal quarters of each fiscal year of the registrant.

(43) The above Section 13(a) and rules promulgated thereunder required HBI, as an issuer of securities registered pursuant to Section 12 of the Exchange Act, to make periodic reports with the SEC. Such reports should have disclosed material facts relating to HBI's financial condition and methods of doing business, including curtailment of business and corporate control imposed upon it by the New York banks, restrictions imposed upon it under the agreement with the Comptroller of the Currency, and other conditions adversely affecting its financial status.

(44) During the period from January 1, 1974 through February of 1976, HBI failed to properly disclose in its reports to the SEC many material facts as set forth in the above findings of fact. The defendants, Chepul and Holliday, as the responsible officials in HBI, participated in these omissions. The Court concludes that these nondisclosures were material within the meaning of Section 13(a). These nondisclosures were also recklessly made and constituted violations of Section 13(a).

(45) Section 14(a) of the Exchange Act, [15 U.S.C. § 78n(a)] states:

"It shall be unlawful for any person, by the use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 78*l* [Section 12 of the Exchange Act] of this title."

(46) Rule 14a–9 [17 C.F.R. § 240.14a–9] states:

"No solicitation subject to this regulation shall be made by means of any proxy statement, form of proxy, notice of meeting or other communication, written or oral, containing any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading or

necessary to correct any statement in any earlier communication with respect to the solicitation of a proxy for the same meeting or subject matter which has become false or misleading.

"(b) The fact that a proxy statement, form of proxy or other soliciting material has been filed or examined by the Commission shall not be deemed a finding by the Commission that such material is accurate or complete or not false or misleading, or that the Commission has passed upon the merits of or approved any statement contained therein or any matter to be acted upon by security holders. No representation contrary to the foregoing shall be made."

(47) The defendants Chepul and Holliday were primarily involved in the preparation and review of proxy material issued from May of 1972 to February, 1976, and had a duty to fully and fairly disclose material facts known to them in proxy materials disseminated to HBI shareholders.

(48) The proxy material sent to HBI shareholders during the above period failed to disclose material facts, set forth in the findings of fact. *TSC Industries, Inc. v. Northway, Inc.*, 426 U.S. 438, 96 S.Ct. 2126, 48 L.Ed.2d 757 (1976).

(49) The defendants Chepul and Holliday, in failing to disclose such material facts, acted in a reckless manner which was unreasonable and in the face of the obvious need to provide shareholders with accurate information in proxy solicitation material.

(50) Though it is unclear whether scienter is always required to constitute a violation of Section 14(a), *Ash v. LFE Corp.*, 525 F.2d 215 (3rd Cir. 1975), the recklessness definition for scienter adopted by the Sixth Circuit is certainly adequate to support a violation of Section 14(a) by a corporate officer responsible for the preparation of the proxy material. *Gerstle v. Gamble-Skogmo, Inc.*, 478 F.2d 1281, 1298 (2nd Cir. 1973); *Adams v. Standard Knitting Mills, Inc.*, 623 F.2d 422, 428 (6th Cir. 1980).

The Court concludes that the defendants Chepul and Holliday violated Section 14(a).

(51) In determining whether to grant an injunction pursuant to Section 20 of the Securities Act [15 U.S.C. § 77t] and Section 21 of the Exchange Act [15 U.S.C. § 78u] the following factors are appropriate for consideration:

". . . the egregiousness of the defendant's actions, the isolated or recurrent nature of the infraction, the degree of scienter involved, the sincerity of the defendant's assurances against future violations, the defendant's recognition of the wrongful nature of his conduct, and the likelihood that the defendant's occupation will present opportunities for future violations." *SEC v. Blatt*, 583 F.2d 1325 (5th Cir. 1978).

(52) In considering the above factors, the Court is of the opinion that the evidence does not establish any likelihood that defendant Holliday will commit or have opportunities to commit future violations of these Securities laws in his position with C & C Capital Corporation and no order enjoining such future violations will be entered against him.

(53) The Court is further of the opinion that defendant Chepul's job with United Carolina Bancshares presents him with substantially the same opportunities to violate the Securities laws as he experienced with HBI. As the Court has determined that the defendants committed numerous violations of the Securities laws with a reckless disregard for the consequences of their actions, defendant Chepul will be enjoined from future violations of those laws.

A judgment will enter in accordance with these findings and conclusions.