144 P.3d 1

In the Matter of TRIVECTRA, aka Trivectra, Inc.; Curtis N. Gushi; Donovan D. Oda, Respondents–Appellants–Appellants,

v.

Ryan S. USHIJIMA, Commissioner of Securities, Department of Commerce and Consumer Affairs, State of Hawai'i; State of Hawai'i, Department of Commerce and Consumer Affairs, Appellees–Appellees.

No. 25312.

Supreme Court of Hawai'i.

Sept. 11, 2006.

Neal K. Aoki of Koshiba Agena & Kubota, on the briefs, Honolulu, for respondents-appellants-appellants TriVectra, Inc., Curtis N. Gushi and Donovan D. Oda.

Richard A. Young, Securities Enforcement Branch, Department of Commerce and Consumer Affairs, State of Hawai'i, on the briefs,

for appellees-appellees Ryan S. Ushijima, Commissioner of Securities, Department of Commerce and Consumer Affairs; State of Hawai'i, Department of Commerce and Consumer Affairs.

MOON, C.J., LEVINSON, NAKAYAMA, and DUFFY, JJ.; and ACOBA, J., Concurring Separately and Dissenting.

Amended Opinion of the Court by LEVINSON, J.

The appellants-appellants TriVectra, Inc., Curtis N. Gushi, and Donovan D. Oda [hereinafter, collectively, "the Appellants"] [1] appeal from the August 27, 2002 judgment of the circuit court of the first circuit, the Honorable Eden Elizabeth Hifo presiding, affirming the February 14, 2002 final order of Ryan S. Ushijima, Commissioner of Securities of the State of Hawai'i Department of Commerce and Consumer Affairs (DCCA) [hereinafter, "the commissioner"]. The commissioner concluded that the Appellants had violated several provisions of Hawai'i Revised Statutes (HRS) ch. 485, the Uniform Securities Act, and ordered them: (1) to cease and desist transacting in securities until they came into compliance with HRS ch. 485; (2) to provide their customers with the option to rescind the customers' contracts with the Appellants; and (3) to pay a fine of $100,000.00.

On appeal, the Appellants allege: (1) that the commissioner's determination that the Appellants' activities constituted the creation of investment contracts was clearly erroneous and an error of law; (2) that the commissioner erred in concluding that the Appellants had violated HRS ch. 485; (3) that the commissioner's issuance of the final order without providing the Appellants an opportunity to respond to the findings of fact (FOFs) and conclusions of law (COLs) contained therein violated the Appellants' statutory rights under HRS § 91–11 (1993); [2] (4) that the issuance of the final order sixteen months after the issuance of the original cease and desist order (CDO) and eleven months after the issuance of the hearings officer's recommended order violated the Appellants rights to a final decision within a reasonable time, pursuant to HRS §§ 91–12 (1993) [3] and 485–18.7 (1993); [4] and (5) that the imposition of a $100,000.00 fine on the Appellants was arbitrary, capricious, and an abuse of discretion. For the reasons discussed more fully *infra* in part III, the Appellants' arguments are without merit. Accordingly, this court affirms the circuit court's August 27, 2002 judgment.

## I. *BACKGROUND*

The present appeal arises out of activities of the Appellants in running an internet-

1. According to the record, Gushi and Oda "are the owners and sole general partners" of TriVectra.

2. HRS § 91–11 provides:

Whenever in a contested case the officials of the agency who are to render the final decision have not heard and examined all of the evidence, the decision, if adverse to a party to the proceeding other than the agency itself, shall not be made until a proposal for decision containing a statement of reasons and including determination of each issue of fact or law necessary to the proposed decision has been served upon the parties, and an opportunity has been afforded to each party adversely affected to file exceptions and present argument to the officials who are to render the decision, who shall personally consider the whole record or such portions thereof as may be cited by the parties.

3. HRS § 91–12 provides in relevant part:
. . . The agency shall notify the parties to the proceeding by delivering or mailing a certified copy of the decision and order and accompa-

nying findings and conclusions within a reasonable time to each party or to the party's attorney of record.

4. HRS § 485–18.7 provides in relevant part:

(b) Upon the issuance of a [cease and desist] order by the commissioner under subsection (a), the commissioner shall promptly notify the respondent that an order has been issued and the reasons therefor and that upon the receipt of a written request made within thirty days the matter will be set for a hearing to commence within fifteen business days after receipt of the request unless extended by the commissioner for good cause. During the pendency of any hearing requested under this subsection, the cease and desist order shall remain in effect unless vacated or modified by the commissioner; provided that any penalty shall not take effect until the final order is issued.
(c) After the hearing, the commissioner shall issue a final order that shall affirm, vacate, or modify the order in effect during the pendency of the hearing. . . .

based business. Beginning in late 1999, the Appellants sold online "shopping malls" [hereinafter "OSMs"] that allowed private individuals, [hereinafter "members"], to host a customized website containing links to brand name retailers such as Disney and Warner Bros. Members paid $79.00 for three months of service, which included maintenance, server hosting, and assistance with web design.

TriVectra obtained the bulk of its links to brand-name retailers through the services of Linkshare Corporation, which allowed individuals to register as affiliates and download and run links to retailers free of charge. Oda registered as an affiliate in December 1999, but the commissioner found that, under the terms of the Linkshare agreement, Oda was not authorized to sublicense, transfer, or assign those links to other individuals.[5]

The terms of the agreement under which the mall owners operated allowed them to make money either (1) through commissions earned from online merchants whenever a purchase was made by a third party using a link from the member's website or (2) by recruiting other people to purchase OSMs. The Appellants sold the OSM program through training meetings and TriVectra's website. In this way, the Appellants testified that they sold between 300 and 400 OSMs by early 2000. Participants later testified that the focus of the meetings was on recruitment of new OSM members rather than on the means by which to generate sales commissions through purchases from OSM websites. During the period leading up to February 23, 2000, a total of $154.43 in purchases was made through all OSMs combined, resulting in total commissions of $6.25.

As for the second method of earning income, i.e., selling OSMs to new customers, members were compensated for recruiting additional mall owners through a multitiered program of "Vectoring," "Power Up," and "Power Up Matching," wherein the successful recruiters were paid commissions depending on the number of new OSM buyers they

secured for TriVectra. TriVectra's marketing materials emphasized large potential returns for members through the OSM sales program, demonstrating how commissions totaling $2,097,144 were possible, presupposing the recruitment of 393,216 new investors. The Appellants later informed DCCA investigator Mary Donahue that, of the seventy-nine-dollar fee, TriVectra applied approximately thirty dollars to technical support costs and fifty dollars to paying commissions to individuals who sold additional OSMs to new members.

Following DCCA's investigation, on October 11, 2000, the commissioner issued a Preliminary CDO against the Appellants. Pursuant to an October 18, 2000 request for a hearing filed by the Appellants, DCCA Hearings Officer Richard Marshall conducted a hearing on December 18 and 19, 2000.

One OSM member who testified at the hearing was Lori–Ann Navares, who attend a TriVectra training meeting in late 1999. According to Navares, at the meeting Gushi emphasized earning commissions through the sales of OSMs to others rather than how to earn commissions through operating an OSM. At the meeting, Navares bought ten OSMs for a discounted total of $600.00. She testified that Gushi told her that "if we owned ten stores, I think [we] were part of a certain program where [we] would get a certain commission off of what the company made." Navares also testified that, at a subsequent meeting in early 2000, she paid Gushi an additional $3500.00 for at least forty new OSMs, in reliance on a promise from him to locate buyers for those OSMs:

Q: Why did you pay $3500?

[Navares]: Because that was another special they had; that if—there was only a certain amount of people, and if you signed up and you paid $3500—I think 40–something stores, that they would find store owners for you.

Q: Who told you this?

---

5. Linkshare offered a Signature Program wherein affiliates could designate their commissions to charities and other third parties, with Linkshare approval. Though disputed by the Appellants, the commissioner found that Oda had not registered under this program and that TriVectra, by subleasing Oda's account to its members, was therefore in violation of its agreement with Linkshare. A review of the evidence does not demonstrate that the commissioner clearly erred in this finding, see infra section III.B.4.b.

[Navares]: Mr. Gushi.

Q: Did Mr. Gushi or Mr. Oda or anyone else ever find 40 other store owners for you?

[Navares]: I think they found a couple.

Q: But not 40?

[Navares]: No, not that I know of.

Navares testified during cross-examination by the Appellants' counsel that Gushi did not represent that he already had the new buyers lined up, but rather that he would endeavor to locate some, and that no specific time frame for providing them was established. It was shortly after Navares paid the $3500.00 that DCCA issued its CDO.

The Appellants maintained that TriVectra did not require an individual to purchase an OSM in order to earn commissions on the sale of OSMs to others. However, Navares testified regarding the issue, in response to inquiries from Marshall, as follows:

[Marshall]: So it was your understanding that you could bring people to meetings, let's say, to promote it; and if they joined—if enough of them joined, you would get money for having brought them in, and their having become members, even if you never bought into the mall web site yourself?

[Navares]: No, you couldn't.

[Marshall]: You could not?

[Navares]: Right.

[Marshall]: So you had to buy into the mall web site first?

[Navares]: Yes.

At the hearing, as part of DCCA's argument that the Appellants engaged in fraudulent activity in violation of HRS ch. 485, the Appellees asserted that TriVectra received the OSM marketing links free of charge from Linkshare, that Oda's practice of assigning those links to members as subaffiliates was in violation of Oda's agreement with Linkshare, and that TriVectra never revealed to potential members that the OSM links could be obtained directly from Linkshare free of charge.

The Appellants admitted that the OSM service provided to TriVectra's customers was available from Linkshare free of charge and that they never so informed the members. Oda asserted, however, that, while Linkshare's software was free, additional technical expertise, provided by TriVectra, was necessary to create and maintain a viable, attractive website. The Appellants also contested the DCCA's assertion that TriVectra assigned subaffiliate links to members in violation of Oda's agreement with Linkshare.

Early in the hearing, DCCA called as a witness Linkshare's General Counsel, Miriam Gadden, who testified by telephone from the mainland that Linkshare had no record of any agreement with Oda to allow him more than one affiliate membership and that hosting 300 to 400 members under his account would be in violation of his agreement with Linkshare. She admitted on cross-examination that Linkshare allowed affiliates in its Signature Program to secure numerous subaffiliates; she further testified, however, that as far as she knew, Linkshare had no written agreement with Oda approving his participation in that program.

On the other hand, the Appellants adduced evidence that Oda contacted Jean–Louis Richiardone at Linkshare on January 24, 2000 and submitted an application for the Signature Program, receiving indications from Richiardone that approval would be forthcoming within twenty-four hours. In addition, the Appellants cited to Linkshare internal correspondence from the company's chief information officer stating that TriVectra's account was operating in the Linkshare software system under the Signature Program. Finally, the Appellants raised with Gadden the contents of Exhibit B, printouts from Linkshare's monthly affiliate report compiled for TriVectra, containing more than one hundred apparent member identification numbers under the TriVectra umbrella.

Gadden refused, however, to concede that TriVectra was duly registered under the Signature Program, asserting that the chief information officer's statement did not necessarily establish that a legal agreement existed between Oda and Linkshare, and, inasmuch as she did not have a copy of Exhibit B in front of her, she refused to draw any conclusions based on anything contained in the exhibit as to Oda's membership in the

Program. TriVectra's counsel did not respond to Gadden's repeated invitations to fax Exhibit B to her. Finally, the following exchange took place:

Q: Let me ask you—the question I have is really a general one, and that is: If this report shows ID numbers on the report—

[Gadden]: But member ID may be just affiliate identification numbers. It doesn't necessarily mean it has to be a subaffiliate. So, for instance, TriVectra Donovan Oda, they have a member ID No. SID 225875. That's their member ID number.

Q: Well, let me read off some Member ID numbers here. It says, for example, 0001–000, and there's another member ID No. 0002–0001 . . . .

[Gadden]: But there's a prefix to them. Does it say SID or MID[?] What's the prefix before the number[?]

Q: Let me ask you this: Assuming that you have a member ID for an affiliate, there would be only one member ID; correct?

[Gadden]: Right. But with respect to what you are asking me to identify, it's probably preceded by either an MID or an SID, so I can know what it is.

Q: Let me just ask you a general question. If an affiliate Linkshare was dealing with, just one affiliate without any subaffiliates, there would only be one member ID number; is that correct?

[Gadden]: There's only one member ID number for an affiliate.

Q: If an affiliate has sub-affiliates, there would be numerous or multiple member ID numbers; would that be correct?

[Gadden]: There would be another U1 identification. So it would either say, "Subaffiliate Identification," or "Sub ID Number," or something that will indicate that it is a subaffiliate. That's why I am

asking if you would tell me what the prefix is, then I can better help you.

Q: You have answered my question so let me move on to something else here.

With regard to Gadden's comments, it should be noted that there are no prefixes to the member ID numbers listed in Exhibit B.

To support the DCCA's contention that the Appellants violated the specified provisions of HRS ch. 485, the Appellees entered an affidavit into evidence from Henry Tanji, a securities compliance specialist with DCCA, averring that a diligent search of DCCA records reflected neither that Gushi or Oda were registered as securities dealers with the commissioner nor that TriVectra's OSM marketing program was registered with DCCA as a security, nor that TriVectra's advertising materials were similarly registered.

On January 10, 2001, Marshall issued FOFs, COLs, and a recommended order proposing that the commissioner dissolve the October 11, 2000 CDO and dismiss the matter. Marshall's recommended order, applying the long-standing test for what constitutes a "security" articulated in *State ex rel. Comm'r of Sec. v. Hawaii Mkt. Ctr., Inc.*, 52 Haw. 642, 485 P.2d 105 (1971), *see infra* section III.A, concluded that the Appellees had failed to establish by a preponderance of the evidence that the Appellants had offered or sold "investment contracts" or "securities" so as to bring their activities within the purview of HRS ch. 485. Marshall found that the subscription fee of $79.00 for three months was for the purchase of a product and not initial value paid as an investment and, hence, that the first prong of the *Hawaii Mkt. Ctr.* test was not fulfilled.

DCCA filed exceptions to the recommended order on January 26, 2001, and TriVectra filed a statement of support on February 12, 2001, requesting oral argument. On April 27, 2001, both parties presented oral arguments before the commissioner, pursuant to Hawai'i Administrative Rules (HAR) § 16–201–46 (1990).[6] On February

---

6. HAR § 16–201–46 provides:

Whenever written exceptions have been timely filed and a party has requested the opportunity to present oral argument, all parties to the proceedings shall be afforded the opportunity to present oral argument to the

authority concerning the recommended decision. The authority shall personally consider the whole record or portions of the record as may have been cited by the parties either in support of or in opposition to the recommended decision. . . . Within a reasonable time

14, 2002, the commissioner, "after carefully considering the [r]ecommended [o]rder, exceptions, statement in support, oral arguments, and evidence presented at the hearing, and listening to the tape of the hearing," issued a final order. The final order set forth modified FOFs and COLs and concluded that the Appellants' program *did* constitute the sale of securities, pursuant to the four-pronged *Hawaii Mkt. Ctr.* test, *see infra* section III.A. In reaching his conclusion, the commissioner determined that $49.00 of the $79.00 three-month fee was in excess of the value of the web-based shopping mall business and hence was "initial value" paid by purchasers as an investment in the venture, pursuant to the first prong of the test.

Based on the determination that the Appellants were selling securities, the commissioner concluded that they had violated several sections of HRS ch. 485: (1) HRS § 485–8 (Supp.1998);[7] (2) HRS § 485–14 (Supp.1998);[8] and (3) HRS §§ 485–25(a)(1), (2), (3), and (7) (1993).[9] The commissioner's final order required the Appellants: (1) to cease and desist from making any offers to sell or purchase securities until they came into compliance with HRS ch. 485; (2) to rescind at the option of Hawaiʻi residents all contracts regarding the purchase and sale of the securities in question; and (3) jointly and severally to pay a fine of $100,000.00.

On March 28, 2002, the Appellants filed a notice of appeal in the first circuit court. On August 27, 2002, the circuit court entered judgment, affirming the commissioner's final order. On September 10, 2002, the Appellants filed a timely notice of appeal to this court.

## II. *STANDARD OF REVIEW*

 Review of a decision made by the circuit court upon its review of an agency's decision is a secondary appeal.... [T]his court must determine whether the circuit court was right or wrong in its decision, applying the standards set forth in HRS § 91–14(g) [ (1993) ] to the agency's decision.

*Korean Buddhist Dae Won Sa Temple of Hawaii v. Sullivan,* 87 Hawaiʻi 217, 229, 953 P.2d 1315, 1327 (1998). HRS § 91–14, entitled "Judicial review of contested cases," provides in relevant part:

(g) Upon review of the record the court may affirm the decision of the agency or remand the case with instructions for further proceedings; or it may reverse or modify the decision and order if the substantial rights of the petition-

after argument has been heard, the authority shall issue a written final decision and order, either adopting, modifying, or reversing, in whole or in part, the hearings officer's recommended decision.
*Available at* http://hawaii.gov/dcca/areas/oah/main/har/har_oah_201.pdf.

7. HRS § 485–8 provides in relevant part:
It shall be unlawful for any person to sell or offer to sell in the State, any security except of a class exempt under [HRS §] 485–4 or unless sold or offered in any transaction exempt under [HRS §] 485–6 or unless it is a federal covered security, unless the security has been registered by notification or by qualification as hereinafter provided.

8. HRS § 485–14(a) provides in relevant part that "[i]t is unlawful for any person to transact business in this State as a dealer ... [or] salesperson ... unless registered under this chapter." Effective May 30, 2000, July 1, 2001, July 1, 2002, and June 15, 2004, the legislature amended HRS § 485–14 in respects immaterial to the present matter. *See* 2004 Haw. Sess. L. Act 121, §§ 57 and 62 at 490–94; 2002 Haw. Sess. L. Act 32, §§ 3 and 5 at 102–03; 2001 Haw. Sess. L. Act

16, §§ 3 and 16 at 31–37, 38, Act 129, §§ 104 and 108 at 334–35; 2000 Haw. Sess. L. Act 149, §§ 5 and 8 at 295–300, 302.

9. HRS § 485–25(a) provides in relevant part:
(a) It is unlawful for any person, in connection with the offer, sale, or purchase ... of any security ... in the State, directly or indirectly:
(1) To employ any device, scheme, or artifice to defraud;
(2) To make any untrue statement of a material fact or omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they are made, not misleading;
(3) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person;
....
or
(7) To issue, circulate, or publish any advertising matter unless a copy thereof has been previously filed with the office of the commissioner, or unless the commissioner has by rule or order exempted the filing of any advertising material.

ers may have been prejudiced because the administrative findings, conclusions, decisions, or orders are:

(1) In violation of constitutional or statutory provisions; or

(2) In excess of the statutory authority or jurisdiction of the agency; or

(3) Made upon unlawful procedure; or

(4) Affected by other error of law; or

(5) Clearly erroneous in view of the reliable, probative, and substantial evidence on the whole record; or

(6) Arbitrary, or capricious, or characterized by abuse of discretion or clearly unwarranted exercise of discretion.

"[U]nder HRS § 91–14(g), [COLs] are reviewable under subsections (1), (2), and (4); questions regarding procedural defects under subsection (3); [FOFs] under subsection (5); and an agency's exercise of discretion under subsection (6)." *In re Hawaiian Elec. Co.*, 81 Hawai'i 459, 465, 918 P.2d 561, 567 (1996).

*Honda v. Bd. of Trs. of the Employees' Ret. Sys. of the State of Hawai'i*, 108 Hawai'i 212, 230, 118 P.3d 1155, 1173 (2005) (some internal citations omitted) (some brackets in original). Furthermore,

[a]n FOF or a mixed determination of law and fact is clearly erroneous when (1) the record lacks substantial evidence to support the finding or determination, or (2) despite substantial evidence to support the finding or determination, the appellate court is left with the definite and firm conviction that a mistake has been made. We have defined "substantial evidence" as credible evidence which is of sufficient quality and probative value to enable a person of reasonable caution to support a conclusion.

*Freitas v. Admin. Dir. of Courts*, 108 Hawai'i 31, 36–37, 116 P.3d 673, 678–79 (2005) (internal citations omitted) (quoting *In re Wai'ola O Moloka'i, Inc.*, 103 Hawai'i 401, 421, 83 P.3d 664, 684 (2004) (quoting *In re Water Use Permit Applications*, 94 Hawai'i 97, 118–19, 9 P.3d 409, 430–31 (2000))).

## III. DISCUSSION

A. *The circuit court correctly affirmed the commissioner's COL that the Appellants were engaged in the sale of securities.*

■ In *Hawaii Mkt. Ctr.*, 52 Haw. 642, 485 P.2d 105, this court articulated a four-pronged test to determine when a scheme or transaction involved securities or investment contracts within the purview of the Uniform Securities Act, HRS ch. 485, holding that, for purposes of the act, an investment contract is created whenever:

(1) an offeree furnishes initial value to an offeror, and

(2) a portion of the initial value is subject to the risks of the enterprise, and

(3) the furnishing of the initial value is induced by the offeror's promises or representations which give rise to a reasonable understanding that a valuable benefit of some kind, over and above the initial value, will accrue to the offeree as a result of the operation of the enterprise, and

(4) the offeree does not receive the right to exercise practical and actual control over the managerial decisions of the enterprise.

52 Haw. at 648–49, 485 P.2d at 109 (footnote omitted). In determining the existence and amount of "initial value" paid in by an investor who makes a preliminary purchase to participate in the program, we focused on the disparity between the amount paid for the product and the wholesale cost of that product. 52 Haw. at 649, 485 P.2d at 109–10.

[5] The Appellants contend that the commissioner erred in concluding that TriVectra's business product was an investment contract and hence subject to HRS ch. 485. In particular, they argue that the commissioner: (1) clearly erred in finding that $49.00 of the $79.00 fee was used to pay commissions on the sale of additional OSMs; and (2) erred in concluding that the $49.00 was "initial value" under the first prong of the *Hawaii Mkt. Ctr.* test.

### 1. Furnishing initial value

#### a. "Profit" versus "initial value"

The Appellants argue that the $79.00 fee was a fair market price for the OSM website supplied by TriVectra. They further contend that, assuming *arguendo* that the $79.00 fee exceeded the website's operating cost, it should nonetheless be deemed economic "profit" and not "initial value" paid in by the member as part of an "investment contract."[10]

■ What determines whether income paid to an enterprise is "profit"—and hence disposable by the business as it sees fit—or "initial value"—and hence, if all other criteria are met, a security governed by HRS ch. 485—is, according to *Hawaii Mkt. Ctr.*, the purchaser's expectation that money paid to the company is "given in consideration for the right to receive future income from the corporation." 52 Haw. at 650, 485 P.2d at 110.

The Appellants maintain that TriVectra did not require the purchase of an OSM in order to earn commissions selling OSMs to others. Therefore, they contend, any sum in excess of operating costs contained within the $79.00 fee constituted profit to TriVectra that could be applied as TriVectra management saw fit, including paying commissions to individuals who sold additional OSMs through a standard sales representative arrangement. It was therefore wrong, they maintain, for the commissioner to conclude that any part of the $79.00 fee constituted payment as part of an investment contract.

There is substantial evidence in the record, however, that members *were* required to purchase an OSM in order to receive commissions for selling additional OSMs to third parties. TriVectra's marketing information explains that commissions on new OSM sales are a "[m]allowner [b]enefit[ ]." The marketing materials state that "TriVectra Mall Owners earn income in 2 major ways: (1) Direct Commissions on products and services sold at their Malls[; and] (2) Leverage and Residual incomes selling TriVectra [OSMs]," and that "Mall Owners may also leverage their incomes by selling or sponsoring other persons to open their own TriVectra [OSMs]." Nelson Hirata, the DCCA investigator assigned to the case, testified that, at the TriVectra marketing meeting he attended, the Appellants spoke of how members could earn further commissions by selling OSMs to others. Nothing in the record reflects that at that meeting the Appellants ever disavowed the proposition that OSM ownership was a prerequisite to earning commissions. Most importantly, Navares testified that the purchase of an OSM was a prerequisite for earning OSM sales commissions. Therefore, despite Gushi's and Oda's testimony to the contrary, the commissioner was not wrong in concluding that any excess profit was in fact initial value "given in consideration for the right to receive future income from the corporation," *see* 52 Haw. at 650, 485 P.2d at 110.

#### b. The commissioner was not wrong in concluding that $49.00 of the $79.00 fee was initial value.

The Appellants maintain that $79.00 was a fair market price for the OSM product in 2000 and, hence, that there was no excess "initial value." Nevertheless, the commissioner concluded that, of the $79.00 fee, $49.00 was initial value investment, based on the Appellants' admissions that the actual operating cost of the website was approximately $30.00 per member and that the Appellants employed the remainder to pay commissions to members selling additional OSMs.

Under the *Hawaii Mkt. Ctr.* test, in determining "initial value" in the context of purchases required to obtain membership in a venture, the court does not compare the *fair market* price of the product a new member is required to purchase to the amount the new member is actually required to pay for that product; rather, the court compares the

---

10. HRS § 485–1(13) (1993) defines a security in relevant part as "any ... investment contract." Effective July 20, 1998, May 30, 2000, July 7, 2003, and July 1, 2004, the legislature amended HRS § 485–1 in respects immaterial to the present matter. *See* 2004 Haw. Sess. L. Act 121, §§ 54 and 62 at 484–85, 494; 2003 Haw. Sess. L. Act 17, §§ 1 and 3 at 25–26; 2000 Haw. Sess. L. Act 149, §§ 2 and 8 at 291–92, 302; 1998 Haw. Sess. L. Act 258, §§ 2, 3, and 15 at 880–82, 893.

*wholesale* price of the product to the price paid by the participant. 52 Haw. at 649, 485 P.2d at 109–10. The Appellants admitted that the OSM service provided to their customers was available from Linkshare free of charge, although Oda asserted that significant expertise was required to transform the Linkshare software into a viable, attractive website. Given that the wholesale cost of the Linkshare software employed by TriVectra was zero, even allowing for TriVectra's technical input, the commissioner was not wrong in concluding that at least $49.00 was "given in consideration for the right to receive future income from the corporation," 52 Haw. at 650, 485 P.2d at 110, particularly in light of the Appellants' admission that approximately that amount was applied toward OSM commissions. Accordingly, the commissioner was not wrong in concluding that $49.00 of the $79.00 paid in by members was initial value pursuant to the first prong of the *Hawaii Mkt. Ctr.* test.

### 2. *Subject to the risks of the enterprise*

■ Pursuant to the second prong of the *Hawaii Mkt. Ctr.* test, an investment contract is formed when "a portion of the initial value is subject to the risks of the enterprise." 52 Haw. at 648–49, 485 P.2d at 109. The Appellants contend that the second prong addresses the start-up phase of a business, when there is a risk that the enterprise will fail to raise sufficient capital to become operational, and that, therefore, because TriVectra was a fully capitalized business, any monies paid in by members did not fulfill the second prong as being "subject to the risks of the enterprise."

■ It is true that the retail establishment at issue in *Hawaii Mkt. Ctr.* launched operations with only $1000.00 in financing and sought venture capital through the participation of 5000 "founder-members" drawn from the public. 52 Haw. at 644, 485 P.2d at 107. *Hawaii Mkt. Ctr.* made it clear, however, that a product's status as a "security" did not hinge upon whether the business seeking the investment was fully capitalized. Rather, the focus is properly "on the economic realities of security transactions: that is, '[t]he placing of capital or laying out of money in a

way intended to secure income or profit from its employment' in an enterprise." 52 Haw. at 647–48, 485 P.2d at 109 (quoting *Minnesota v. Gopher Tire & Rubber Co.*, 146 Minn. 52, 177 N.W. 937, 938 (1920)). "This subjection of the investor's money to the risks of an enterprise over which he exercises no managerial control is the basic economic reality of a security transaction." 52 Haw. at 648, 485 P.2d at 109 (citations omitted). Although the solicitation of investment capital is perhaps more pronounced when it involves initial venture capital, a fully funded business operation can issue investment contracts or securities in order to raise capital just as readily as a foundling, underfunded venture can. As this court said in *Hawaii Mkt. Ctr.*, "any formula which purports to guide courts in determining whether a security exists should recognize the essential reality and be broad enough to fulfill the remedial purposes of the Securities Act." *Id.* Under the second prong of the *Hawaii Mkt. Ctr.* test, therefore, an investment contract is formed if the capital paid into the business by investors, in order to derive income from the use of that capital in the business, is put at risk in the event the business venture fails.

In the present matter, under TriVectra's program, the payment of initial value was required for an individual to participate in the OSM commission program, *see supra* section III.A.1.a. While, in order to earn commissions, it was necessary that a member make actual sales, by requiring the initial investment payment, TriVectra transformed garden variety sales representatives into equity holders in the enterprise. As such, the members could only realize a return if TriVectra remained viable and sufficiently capitalized to honor its OSM commission commitments. Accordingly, the commissioner was not wrong in concluding that the members' initial value investments were subject to the risks of the enterprise.

### 3. *The circuit court reached the right conclusion in affirming the commissioner's conclusion that the Appellants' product constituted a "security" under HRS ch. 485.*

The Appellants do not contest the commissioner's conclusions pertaining to the final

two prongs of the *Hawaii Mkt. Ctr.* test, *i.e.*, that members' participation was induced by promises of large future returns and that the members exerted no control over TriVectra's operations or management. Inasmuch as the first two prongs of the *Hawaii Mkt. Ctr.* test have been fulfilled pursuant to the preceding analysis, the circuit court was therefore correct in affirming the commissioner's COL that TriVectra's program constituted an investment contract and hence a "security" under HRS § 485–1(13), *see supra* note 10.

B. *The circuit court was correct in affirming the commissioner's conclusion that the Appellants violated the specified provisions of HRS ch. 485.*

1. *HRS § 485–8*

 HRS § 485–8, *see supra* note 7, makes it unlawful to sell an unregistered security. The Appellants admit that they sold between 300 and 400 OSMs and that the OSM product was not registered as a security with DCCA. They do not contend that the OSM product falls within any enumerated statutory exemption. DCCA confirmed that it had no record of any registration. Therefore, pursuant to the commissioner's conclusion that TriVectra's product was indeed a security, it was not wrong for the circuit court to affirm the commissioner's conclusion that TriVectra had violated HRS § 485–8.

2. *HRS § 485–14*

 HRS § 485–14, *see supra* note 8, makes "[i]t ... unlawful for any person to transact business in this State as a dealer ... [or] salesperson ... unless registered

under this chapter."[11] The Appellants admit that they were not duly registered securities traders, and the Appellees adduced uncontested evidence to that effect. The Appellants do not deny that they were engaged in marketing TriVectra's product, which the commissioner concluded constituted a security under the *Hawaii Mkt. Ctr.* test, *see supra* section III.A. Therefore, the circuit court was correct in affirming the commissioner's conclusion that the Appellants violated § 485–14 as dealers in unregistered securities.

3. *Agency enforcement of HRS § 485–25(a)(1) requires scienter, while enforcement of HRS §§ (a)(2) and (a)(3) does not.*

The commissioner, in finding the Appellants in violation of HRS § 485–25(a)(1), *see supra* note 9; *see also infra* section III.B.4, stated that scienter was required to establish liability under that paragraph and that a finding of recklessness was sufficient. In issuing his FOFs and COLs regarding HRS §§ 485–25(a)(2) and 485–25(a)(3), *see infra* sections III.B.5 and III.B.6, however, the commissioner failed to enter any findings with regard to scienter.

 We find no Hawai'i case law addressing the level, if any, of scienter that is required to establish violations of HRS §§ 485–25(a)(1), (a)(2), or (a)(3). Nevertheless, HRS §§ 485–25(a)(1), (a)(2), and (a)(3) contain language virtually identical to both 17 C.F.R. § 240.10b–5 (1999) (concerning securities fraud), often referred to as Rule 10b–5,[12]

11. The commissioner noted that HRS § 485–1(2) (1993) defined "salesperson" to "mean[] any individual other than a dealer who represents a dealer or issuer in effecting or attempting to effect ... sales of securities," and that HRS § 485–1(3) (Supp.1998) defined "dealer" to "mean[] any person engaged in the business of effecting transactions in securities ... for the person's own account." The commissioner correctly concluded that because the Appellants were selling a security, "[u]nder either definition, [the Appellants] can be construed to have acted as a 'dealer' or 'salesperson' " sufficient to support finding a violation of HRS § 485–14. The Appellants did not challenge the conclusion on appeal. Effective May 30, 2000 and April 16, 2003, the legislature amended HRS § 485–1(3)

in ways immaterial to the present matter. *See* 2003 Haw. Sess. L. Act 17, §§ 1 and 3 at 25–26; 2000 Haw. Sess. L. Act 149, §§ 2 and 8 at 291–92, 302.

12. 17 C.F.R. § 240.10b–5 provides:
It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange,
(a) To employ any device, scheme, or artifice to defraud,
(b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances un-

and section 17(a) of the federal Securities Act of 1933, *codified at* 15 U.S.C. § 77q (2000) [hereinafter, "the 1933 Act"].[13] "[I]n instances where Hawai'i case law and statutes are silent, this court can look to parallel federal law for guidance." *Price v. Obayashi,* 81 Hawai'i 171, 181, 914 P.2d 1364, 1374 (1996), *quoted in Gap v. Puna Geothermal Venture,* 106 Hawai'i 325, 333, 104 P.3d 912, 920 (2004); *LeMay v. Leander,* 92 Hawai'i 614, 620, 994 P.2d 546, 552 (2000); *Gold v. Harrison,* 88 Hawai'i 94, 104, 962 P.2d 353, 363 (1998); *State v. Ontai,* 84 Hawai'i 56, 61, 929 P.2d 69, 74 (1996).

Rule 10b–5 was promulgated by the Securities and Exchange Commission (SEC) to give effect to the language of section 10(b) of the Federal Securities Exchange Act of 1934 [hereinafter, "the 1934 Act"], *codified at* 15 U.S.C. § 78j (2000).[14] *Ernst & Ernst v. Hochfelder,* 425 U.S. 185, 212 n. 32, 96 S.Ct. 1375, 47 L.Ed.2d 668 (1976). In drafting Rule 10b–5, however, the SEC drew heavily from the language of section 17(a) of the 1933 Act, *see supra* note 13. *Id.*

The United States Supreme Court has concluded that the language contained in section 10(b) of the 1934 Act—"any manipulative or deceptive device or contrivance," *see supra* note 14—imbues section 10(b) and Rule 10b–5, which draws its authority from section 10(b), with a scienter element, *i.e.,* "knowing or intentional misconduct," that a complaining party must prove to establish a violation of either section 10(b) or Rule 10b–5, regardless of the identify of the plaintiff or the nature of the relief sought. *Hochfelder,* 425 U.S. at 197–201, 96 S.Ct. 1375; *Aaron v. SEC,* 446 U.S. 680, 690–91, 696, 100 S.Ct. 1945, 64 L.Ed.2d 611 (1980); *see also SEC v. Rana Research, Inc.,* 8 F.3d 1358, 1364 (9th Cir.1993) (concluding scienter is required for an SEC agency action to enforce section 10(b) and Rule 10b–5). Conversely, the Court has held that, while scienter must be proved for section 17(a)(1) of the 1933 Act (noting the language of that paragraph "plainly evinces an intent on the part of Congress to proscribe only knowing or intentional misconduct"),[15] scienter need not be

---

der which they were made, not misleading, or

(c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person,

in connection with the purchase or sale of any security.

The text of 17 C.F.R. § 240.10b–5 is materially identical to HRS §§ 485–25(a)(1), (a)(2), and (a)(3). *See supra* note 9.

**13.** 15 U.S.C. § 77q provides in pertinent part:

It shall be unlawful for any person in the sale of any securities ... by the use of any means or instruments of transportation or communication in interstate commerce or by use of the mails, directly or indirectly—

(1) to employ any device, scheme, or artifice to defraud, or

(2) to obtain money or property by means of any untrue statement of a material fact or any omission to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or

(3) to engage in any transaction, practice, or course of business which operates or would operate as a fraud or deceit upon the purchaser.

**14.** 15 U.S.C. § 78j provides in relevant part:

It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce or of the

mails, or of any facility of any national securities exchange—

. . . .

(b) To use or employ, in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered, ... *any manipulative or deceptive device or contrivance* in contravention of such rules and regulations as the [Securities and Exchange] Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors.

(Emphasis added.)

**15.** As to the *level* of scienter necessary to establish a violation of section 17(a)(1), the United States Court of Appeals for the Ninth Circuit has concluded that a finding of "knowing or reckless conduct" is sufficient. *Vernazza v. SEC,* 327 F.3d 851, 860 (9th. Cir.2003) (citing *SEC v. Dain Rauscher, Inc.,* 254 F.3d 852, 856 (9th Cir.2001)). Other federal courts have concurred. *See Meadows v. SEC,* 119 F.3d 1219, 1226 (5th Cir.1997); *SEC v. Carriba Air, Inc.,* 681 F.2d 1318, 1324 (11th Cir.1982); *SEC v. Kenton Capital, Ltd.,* 69 F.Supp.2d 1, 10 (D.D.C.1998); *Baker v. Eagle Aircraft, Co.,* 642 F.Supp. 1005, 1009 (D.Or.1986); *SEC v. Youmans,* 543 F.Supp. 1292, 1299 (E.D.Tenn.1982), *rev'd on other grounds, SEC v. Youmans,* 729 F.2d 413 (6th Cir.1984). This conclusion also comports with the federal courts' analysis of scienter under Rule 10b–5, similarly based on language connot-

proved to establish violations of sections 17(a)(2) or (a)(3) (noting, respectively, that the language of (a)(2) "is devoid of any suggestion whatsoever of a scienter requirement" and that the language of (a)(3) "quite plainly focuses upon the *effect* of particular conduct ... rather than upon the culpability of the person responsible"). *Aaron,* 446 U.S. at 695–97, 100 S.Ct. 1945 (emphasis in original). In sum, analyzing the language of either the 1933 Act or the 1934 Act, the Court has required scienter for securities violations based on language identical to that found in HRS § 485–25(a)(1), *see supra* notes 9, 12, and 13, but, in analyzing the language mirrored in HRS §§ 485–25(a)(2) and (a)(3), the Court has concluded that virtually identical language either does *not* require scienter, if rooted in section 17(a), or *does* require scienter, if rooted in section 10(b) and Rule 10b–5, due to the underlying "manipulative or deceptive" language of section 10(b) and its effect on the substantive elements of Rule 10b–5.

In 1956, the National Conference of Commissioners on Uniform State Laws (NCCUSL) approved for adoption by all states the Uniform Securities Act [hereinafter, "USA 1956"]. Sen. Stand. Comm. Rep. No. 231, in 1957 Senate Journal, at 520. Effective June 7, 1957, the Hawai'i legislature adopted USA 1956. 1957 Haw. Sess. L. Act 314, §§ 1 and 2 at 392, 420. Section 101 of USA 1956 was codified as HRS §§ 485–25(a)(1), (a)(2), and (a)(3).[16] The comments to section 101 indicate that "this section is substantially [Rule 10b–5], which in turn was modeled upon [section] 17(a) of the Securities Act of 1933, ... except that the rule was expanded to cover the purchase as well as

the sale of any security." This language is ambiguous, in that it does not clearly establish whether HRS §§ 485–25(a)(1), (a)(2), and (a)(3) are grounded in the Securities Act of 1933 or in section 10(b) of the Securities Exchange Act of 1934 through Rule 10b–5.

In construing an ambiguous statute, the courts may resort to extrinsic aids in determining the legislative intent. One avenue is the use of legislative history as an interpretive tool.

*Gray [v. Admin. Dir. of the Court* ], 84 Hawai'i [138,] 148, 931 P.2d [580,] 590 [ (1997) ]. This court may also consider "[t]he reason and spirit of the law, and the cause which induced the legislature to enact it ... to discover its true meaning." HRS § 1–15(2) (1993). "Laws in pari materia, or upon the same subject matter, shall be construed with reference to each other. What is clear in one statute may be called upon in aid to explain what is doubtful in another." HRS § 1–16 (1993).

*State v. Cullen,* 86 Hawai'i 1, 9, 946 P.2d 955, 963 (1997) (some brackets in original and some internal citations omitted).

In enacting USA 1956, the Senate Judiciary Committee stated that "[t]he Bill expands the anti-fraud provisions of the present statutes by adopting those of the Uniform Act which in turn *are based upon the provisions of the Federal Securities Act of 1933* as interpreted by the courts[ ] and the Securities and Exchange Commission." Sen. Stand. Comm. Rep. No. 231, in 1957 Senate Journal, at 521. (Emphasis added.) The House Judiciary Committee expressed virtually identical

---

ing fraudulent intent, concluding that recklessness is sufficient scienter to establish a violation. *See Magna Inv. Corp. v. John Does One Through Two Hundred,* 931 F.2d 38, 39 (11th Cir.1991); *Hackbart v. Holmes,* 675 F.2d 1114, 1117 (10th Cir.1982); *G.A. Thompson & Co. v. Partridge,* 636 F.2d 945, 959 (5th Cir.1981); *Mansbach v. Prescott, Ball & Turben,* 598 F.2d 1017, 1023 (6th Cir.1979); *Nelson v. Serwold,* 576 F.2d 1332, 1337 (9th Cir.1978); *Rolf v. Blyth, Eastman Dillon & Co.,* 570 F.2d 38, 44 (2d Cir.1978); *Sundstrand Corp. v. Sun Chem. Corp.,* 553 F.2d 1033, 1045 (7th Cir.1977).

**16.** Section 101 reads as follows:

It is unlawful for any person, in connection with the offer, sale, or purchase of any security, directly or indirectly

(1) to employ any device, scheme, or artifice to defraud,

(2) to make any untrue statement of material fact or to omit to state a material fact necessary in order to make the statements made, in the light of circumstances under which they are made, not misleading, or

(3) to engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person.

Unif. Sec. Act § 101 (1956), 7C U.L.A. 110 (2000 & Supp.2006).

views. *See* Hse. Stand. Comm. Rep. No. 931, in 1957 House Journal, at 900.

A review of the jurisprudence of other states that have enacted USA 1956 reveals an almost unanimous interpretation of section 101, as enacted in the respective states, as: (1) being rooted in section 17(a) of the Securities Act of 1933, not section 10(b) of the Securities Exchange Act of 1934; and (2) in concluding that no proof of scienter is required to establish a civil violation of the state equivalent of section 17(a)(2) or (a)(3)— Hawaii's HRS §§ 485–25(a)(2) or (a)(3). *See Arizona v. Gunnison,* 127 Ariz. 110, 618 P.2d 604, 607 (1980) (noting that the Arizona equivalent of HRS § 485–25(a)(2) is a counterpart to section 17(a)(2) and holding scienter is not required in civil cases, based on plain language analysis and *Aaron* ); *Idaho v. Shama Res. Ltd. P'ship,* 127 Idaho 267, 899 P.2d 977, 982 (1995) (noting that the Idaho equivalent of HRS §§ 485–25(a)(2) and (a)(3) are "virtually identical" to sections 17(a)(2) and (a)(3) and holding that a showing of scienter is not required for agency enforcement, based on plain language analysis and *Aaron* ); *Manns v. Skolnik,* 666 N.E.2d 1236, 1248 (Ind.App.1996) (in an agency enforcement action, concluding that violations of the Indiana equivalent of HRS § 485–25(a)(2) need not establish intent, based solely on plain language analysis); *Kansas v. Kershner,* 15 Kan.App.2d 17, 801 P.2d 68, 69–71 (1990) (noting that the Kansas Securities Act (KSA) is patterned on the Uniform Securities Act and the federal Securities Act of 1933 and concluding no specific intent is required to prove a violation of the KSA, beyond wilfulness for a criminal violation); *Sprangers v. Interactive Techs., Inc.,* 394 N.W.2d 498, 503 (Minn.Ct.App.1986) (concluding Minnesota equivalent of HRS § 485–25(a)(2) was rooted in section 17(a)(2) of the 1933 Securities Act and therefore does not require scienter in civil actions for recovery); *Sec'y of State v. Tretiak,* 117 Nev. 299, 22 P.3d 1134, 1141 (2001) (concluding the equivalents of HRS §§ 485–25(a)(2) and (a)(3) do not require scienter in an agency enforcement action, based on plain language analysis

and in keeping with other state courts and *Aaron* ); *Treider v. Doherty & Co.,* 86 N.M. 735, 527 P.2d 498, 499 (App.Ct.1974) (concluding that the intent of the actor in a violation of the equivalent of HRS § 485–25(a)(2) is irrelevant); *Utah v. Larsen,* 865 P.2d 1355, 1360 (Utah 1993) (noting the Utah equivalents of HRS §§ 485–25(a)(2) and (a)(3) are not limited by the underlying language of section 10(b) of the Securities Exchange Act of 1934, but are analogous to sections 17(a)(2) and (a)(3) of the Securities Act of 1933 and, in keeping with *Aaron,* concluding that the Utah equivalent of HRS § 485–25(a)(2) does not require scienter); *Fibro Trust, Inc. v. Brahman Fin., Inc.,* 974 P.2d 288, 294 (Utah 1999) (concluding that the Utah equivalent of HRS § 485–25(a)(1) requires scienter, while the equivalent of HRS § 485–25(a)(3) does not, based on other states' interpretations and *Aaron* ); *Tanner v. State Corp. Comm'n,* 265 Va. 148, 574 S.E.2d 525, 530 (2003) (applying the holding of *Aaron* pertaining to section 17(a)(2) to hold scienter is not required to prove a violation of the Virginia equivalent of HRS § 485–25(a)(2) in a civil agency action); *Kittilson v. Ford,* 93 Wash.2d 223, 608 P.2d 264, 265–66 (1980) (concluding scienter is not required to prove a violation of the Washington equivalent of HRS §§ 485–25(a)(1) to (3)); *Wisconsin v. Temby,* 108 Wis.2d 521, 322 N.W.2d 522, 526 (App.Ct.1982) (noting that the Wisconsin equivalents of HRS §§ 485–25(a)(1) to (3) were "almost identical" to section 17(a) and concluding that intent to defraud was not an element of a criminal violation of paragraph (a)(2), based on plain language analysis and *Aaron* ). *But see Manns,* 666 N.E.2d at 1248 (reasoning that the plain language of the Indiana equivalent of HRS § 485–25(a)(3) requires scienter be established).

■ We therefore hold that, in a civil enforcement action brought by an agency, a state of mind of at least recklessness must be established to prove a violation of HRS § 485–25(a)(1), but need not be pled or proven in order to establish a violation of HRS § 485–25(a)(2) or (a)(3).[17] This holding is

---

**17.** In so holding, this court does not reach the question whether scienter is required in a private claim for relief brought under HRS § 485–20

(1993) alleging a violation of HRS §§ 485–25(a)(1), (a)(2) or (a)(3) and, hence, offers no opinion on the decision issued by the United

consistent with the legislative history of HRS ch. 485 as rooted in the Securities Act of 1933 and is in keeping with legislative intent to harmonize Hawaii's securities law with other states' interpretations of the Uniform Securities Act and with state and federal interpretation of federal securities law underlying USA 1956.[18] In the instant matter, the commissioner's findings with regards to the Appellants' scienter are in accord with our holding.

#### 4. *HRS § 485–25(a)(1)*

HRS § 485–25(a)(1), *see supra* note 9, makes it "unlawful for any person, in connection with the offer, sale, or purchase ... of any security ... in the State, directly or indirectly ... [t]o employ any device, scheme, or artifice to defraud."

The commissioner concluded that the Appellants violated HRS § 485–25(a)(1): (1) by inducing Navares to pay Gushi for assistance in finding new OSM buyers; and (2) by failing to disclose to potential buyers that TriVectra was using free Linkshare software and authorizing buyers to use it in violation of TriVectra's agreement with Linkshare.

##### a. *Navares's payment of $3500.00*

■ The commissioner concluded that Gushi's representation to Navares that he would assist her in finding buyers for the more than forty OSMs she purchased at the meeting in early 2000 for $3500.00 "was at[ ] a minimum[ ] recklessly made in disregard of the truth." In so concluding, the commissioner expressly relied upon inferences derived from circumstantial evidence. It is well settled that, "[g]iven the difficulty of proving the requisite state of mind by direct evidence ..., proof by circumstantial evidence and reasonable inferences arising from circumstances surrounding the defendant's conduct is sufficient." *State v. Eastman,* 81 Hawai'i 131, 141, 913 P.2d 57, 67 (1996) (quot-

ing *State v. Batson,* 73 Haw. 236, 254, 831 P.2d 924, 934 (1992)).

The evidentiary record of the exchange between Navares and Gushi is limited. *See* Navares's testimony set forth *supra* in section I. Nevertheless, in deference to the trier of fact, we cannot say that it was error for the circuit court to affirm the commissioner's conclusion that Gushi acted recklessly with respect to the truth of his representation to Navares that, in return for $3500.00, he would recruit at least forty new OSM buyers on her behalf. Therefore, inasmuch as a security was involved in this transaction and the commissioner concluded that a misrepresentation was recklessly made in connection with its sale, the circuit court was correct in affirming the commissioner's conclusion that the Appellants had violated HRS § 485–25(a)(1).

##### b. *The Appellants' failure to disclose the role of Linkshare in TriVectra's operations*

■ The commissioner also concluded that TriVectra had violated HRS 485–25(1) by "fail[ing] to disclose that the software they were using was provided free of charge by Linkshare and without Linkshare's consent[ ] and that prospective purchasers could have obtained the same type of software and service for free by going to Linkshare directly," and, in doing so, that TriVectra demonstrated a reckless disregard for the truth.

The Appellants dispute the commissioner's conclusion that TriVectra's activities were fraudulent and contend that is not unlawful for a private venture to keep its profitable business plans confidential.

There is circumstantial evidence in the record that supports the Appellants' contention that TriVectra had Linkshare's approval to run TriVectra members' OSMs through Oda's account as subaffiliates. In particular,

---

States District Court for the District of Hawai'i in *Am. Sav. Bank v. UBS Painewebber, Inc.,* 250 F.Supp.2d 1254 (D.Haw.2003) (analyzing HRS § 485–25(a)(2) and concluding that, in a private action for damages, scienter and reliance must be established by the plaintiff, based on the conclusion that HRS § 485–25(a)(2) is a fraud statute rooted in Rule 10b–5).

**18.** This holding is also consistent with the structure of USA 2002 recently enacted by the legislature. Section 501 of USA 2002 is the successor to section 101 of USA 1956. 7C U.L.A. 99 (Supp. 2006). The commentary to section 501 states that "in civil and administrative enforcement actions ... no culpability is required to be pled or proven." *Id.* cmt. 6.

Oda proffered uncontested correspondence with Richiardone reflecting TriVectra's imminent approval under its Signature Program. Linkshare's chief information officer indicated in correspondence with Gadden that Linkshare was running Oda's account under the Signature Program. Oda produced printed web pages from the internet summarizing the TriVectra account's monthly activity and containing more than one hundred alleged member identification numbers within the TriVectra account.

Nevertheless, Oda could not produce any written evidence of an agreement produced by Linkshare expressly granting TriVectra membership in the Signature Program, nor could the Appellants' counsel conclusively establish that the member identification numbers that appeared in Exhibit B were in fact subaffiliate member numbers. Linkshare's general counsel, Gadden, insisted that she could locate no written agreement with TriVectra or Oda pertaining to the Signature Program. Therefore, while the evidence raises some concerns that TriVectra may indeed have had Linkshare's authorization for its subaffiliate program, this court is not left with the definite and firm conviction that a mistake has been made.

As for the cost-free nature of Linkshare's software and its effect on TriVectra's profitability, there is some evidence that TriVectra added value to Linkshare's free service by providing web design and technical support. Nevertheless, the core of TriVectra's product, the OSM itself, was wholly dependent on Linkshare's free services. The Appellants did not choose to disclose to customers the free alternative and then attempt to justify the value-added nature of their services. Nor does it appear that the Appellants provided this service with Linkshare's authorization. Given the product's status under HRS ch. 485 as a security, we cannot say that the commissioner was wrong in concluding that the Appellants employed a scheme to defraud investors with a reckless disregard for the truth.

For both of the foregoing reasons, we do not believe the circuit court was wrong in affirming the commissioner's conclusion that the Appellants violated HRS § 485–25(a)(1).

### 5. *HRS § 485–25(a)(2)*

HRS § 485–25(a)(2), *see supra* note 9, makes it "unlawful for any person, in connection with the offer, sale, or purchase ... of any security ... in the State, directly or indirectly ... [t]o make any untrue statement of a material fact or omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they are made, not misleading." The commissioner concluded that TriVectra's failure to inform its customers that TriVectra was sourcing its OSM software from Linkshare free of charge and in violation of the agreement between TriVectra and Linkshare was an omission of a material fact, in that there was " 'a substantial likelihood that its disclosure would have been considered significant by [a] reasonable investor.' " (Quoting *Basic v. Levinson*, 485 U.S. 224, 231, 108 S.Ct. 978, 99 L.Ed.2d 194 (1988).)

Inasmuch as (1) TriVectra was marketing a security subject to HRS ch. 485, (2) Gushi and Oda failed to inform customers that TriVectra was sourcing its software support and core business operations from Linkshare, services that were available free of charge to any member of the public, and (3) TriVectra was doing so in violation of its agreement with Linkshare, we cannot say that the commissioner was wrong in concluding that the Appellants violated HRS § 485–25(a)(2) by omitting a material fact of interest to a reasonable investor. Nor do we believe that the circuit court was wrong in affirming that conclusion.

### 6. *HRS § 485–25(a)(3)*

HRS § 485–25(a)(3), *see supra* note 9, makes it unlawful "for any person, in connection with the offer, sale, or purchase ... of any security ... in the State, directly or indirectly ... [t]o engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person." The commissioner based his conclusion that the Appellants violated this subsection on the same acts and omissions as discussed *supra* in sections III.B.4.b and III.B.5, namely, that withholding the

cost-free nature of Linkshare's software, in combination with the limited affiliate nature of TriVectra's relationship with Linkshare, was a practice that operated to deceive TriVectra's customers. For the reasons discussed above, we perceive no error either in the commissioner's conclusion or in the circuit court's affirmation of it.

### 7. *HRS § 485–25(a)(7)*

■ HRS § 485–25(a)(7), *see supra* note 9, makes it unlawful

> for any person, in connection with the offer, sale, or purchase . . . of any security . . . in the State, directly or indirectly:
>
> . . . .
>
> . . . [t]o issue, circulate, or publish any advertising matter unless a copy thereof has been previously filed with the office of the commissioner, or unless the commissioner has by rule or order exempted the filing of any advertising material.

The commissioner concluded that the Appellants had published marketing materials over the internet to promote TriVectra's OSM program. The Appellants do not contend that they filed any of these materials with the commissioner or that any rule or order exempted them from filing. We therefore cannot say that the commissioner erred in concluding that the Appellants violated HRS § 485–25(a)(7) and hence believe that the circuit court correctly affirmed that conclusion.

### C. *The commissioner did not exceed his authority in issuing a final order, without further hearings, that modified Marshall's recommended order.*

■ The Appellants contend that the commissioner exceeded his statutory authority under HRS § 91–11, *see supra* note 2, by amending Marshall's recommended order without affording the Appellants an opportunity to contest the commissioner's modified FOFs and COLs.

The commissioner's final order expressly stated that, "[a]fter carefully considering the [r]ecommended [o]rder, exceptions, statement in support, oral arguments, and evidence presented at the hearing, and listening to the tape of the hearing, the [c]ommissioner hereby modifies the [h]earing [o]fficer's [FOFs] and [COLs] and issues a [f]inal [o]rder as follows." It is apparent from this statement that the commissioner "personally consider[ed] the whole record." HAR § 16–201–46, *see supra* note 6.

The plain language of HRS § 91–11 requires an additional evidentiary hearing "[w]henever in a contested case the officials . . . who are to render the final decision have not heard and examined all of the evidence." The record in the present matter reflects that the commissioner did in fact hear and examine all the evidence, and the Appellants point to no new evidence that the commissioner overlooked. Therefore, in modifying or reversing the recommended order, powers granted him under HAR § 16–201–46, *see supra* note 6, the commissioner did not violate HRS § 91–11 by failing to provide the Appellants yet another opportunity to repeat their previous arguments.

### D. *The commissioner did not abuse his discretion in setting a fine of $100,000.00.*

■ The Appellants contend that, based on the record, the $100,000.00 fine levied against them under HRS § 485–20.5 (1993) [19] was arbitrary and capricious and constituted an abuse of discretion. "An abuse of discretion occurs when the decisionmaker 'exceeds the bounds of reason or disregards rules or principles of law or practice to the substantial detriment of a party.' " *In re Water Use Permit Applications*, 94 Hawai'i at 183, 9 P.3d at 495 (quoting *Bank of Hawai'i v. Kunimoto*, 91 Hawai'i 372, 387, 984 P.2d 1198, 1213 (1999)), *quoted in State v. Wilmer*, 97 Hawai'i 238, 243, 35 P.3d 755, 760 (2001); *State v. Vliet*, 95 Hawai'i 94, 108, 19 P.3d 42, 56 (2001).

---

19. HRS § 485–20.5(a) provides:
> The commissioner may bring an action to recover a civil penalty against any person who violates this chapter or who has knowingly violated a rule or order of the commissioner made pursuant to this chapter. A civil penalty of not more than $100,000 may be assessed for each violation.

As the Appellants correctly note, the commissioner did not find that they acted with malicious or willful intent. There is evidence in the record that the Appellants were cooperative with DCCA investigators, and the commissioner conceded that TriVectra was a fully-funded company from the outset.

However, the Appellants did make statements in their marketing materials that possible earnings from selling OSMs to others could exceed two million dollars, when, in order to earn such fees, members would have to recruit 393,216 new members in a three-month period. According to the testimony of Hirata and Navares, the overriding focus of the marketing meetings was the recruitment of others into the OSM program, not the earning of commissions from sales on the OSM websites. The Appellants induced Navares to part with $3500.00 in return for unfulfilled promises to locate forty additional OSM buyers for her. During the same period, only $6.25 in commissions was paid on $154.43 worth of purchases through the websites. In light of the foregoing, we cannot say that the commissioner "exceed[ed] the bounds of reason or disregard[ed] rules or principles of law" in levying a fine of $100,000 against the Appellants.

E. *The commissioner's final order was issued within a "reasonable time," pursuant to HRS §§ 91–12 and 485–18.7.*

■ Following the December 18 and 19, 2000 hearings, Marshall issued his recommended order on January 10, 2001. At the request of the parties, the commissioner heard oral arguments on April 27, 2001 regarding the recommended order but did not issue his final order until February 14, 2002, more than nine months later. The Appellants argue that this delay was unreasonably long and in violation of the spirit of HRS §§ 91–12, *see supra* note 3, and 485–18.7, *see supra* note 4: They contend that the fifteen-day time period, imposed on the commissioner by HRS § 485–18.7(b), within which to respond to a request for a hearing on a CDO reflects a legislative intent that CDO dis-

putes be resolved promptly and that, pursuant to HRS § 91–12, disposition "within a reasonable time" does not contemplate a delay of nine months before the issuance of a final order. They assert that because the CDO remains in effect until the issuance of a final order, the effect of delay is to unreasonably and irreparably harm businesses that, in the end, may be adjudged innocent of any violations.

The Appellants' cited authority does not assist them. While HRS § 485–18.7(b) requires the commissioner to schedule an initial hearing within fifteen days of a request by a party affected by a CDO, HRS § 485–18.7(c), governing the issuance of the final order itself, merely states that "the commissioner shall issue a final order," making no mention of reasonable time frames. Furthermore, HRS § 91–12 governs the manner in which the commissioner must notify parties *once a decision and order have been issued.* In other words, once the commissioner has issued a final order, he or she must notify the parties of that order within a reasonable time; the statute is silent with respect to *when* the commissioner must issue a final order.

Nevertheless, when a statute is silent as to an express time frame, this court has imported a "reasonable time" standard. *See Paul's Elec. Serv., Inc. v. Befitel,* 104 Hawai'i 412, 420, 91 P.3d 494, 502 (2004) (citing *State v. Sherman,* 70 Haw. 334, 340–41, 770 P.2d 789, 793 (1989)). Furthermore, under HAR § 16–201–46, *see supra* note 6, the commissioner is required, "[w]ithin a reasonable time after argument has been heard, [to] issue a written final decision and order." It is therefore in that context that we must analyze the alleged delay in this matter.

In *Paul's Elec. Serv.,* the Department of Labor and Industrial Relations (DLIR) delayed issuance of a third notice of violation (NOV) against the company for two-and-a-half years because the DLIR wanted to determine the outcome of its investigation of the second NOV against the respondent.[20] This court ruled that the delay was unreasonable, because DLIR had offered no justifica-

---

20. Pursuant to HRS § 104–24 (Supp.1995), the punishment of confirmed violations depended on the number of prior offenses committed by a company within two years.

tion for delaying the *initiation* of its investigation; rather, DLIR had urged merely that an assessment of the appropriate *sanction* was dependent on the outcome of the second NOV. 104 Hawai'i at 420–21, 91 P.3d at 502–03. We held that because there was no impediment to DLIR launching its investigation into the third alleged NOV two-and-a-half years earlier, the delay was unjustified and unreasonable.

In the present matter, it is undisputed that the commissioner followed all relevant administrative requirements in issuing the CDO, holding hearings, responding to exceptions, and scheduling oral arguments. While nine months between oral argument regarding the recommended order and the issuance of the final order is a substantial time for an aggrieved party to wait, there is no indication here, in contrast to *Paul's Elec. Serv.*, that the delay was caused by an unjustified agency decision to postpone resolution of the matter or was so outside the bounds of the workings of a large and complex bureaucracy as to be deemed unreasonable *per se*. In sum, the commissioner's action in issuing the final order nine months after oral argument was not "characterized by an abuse of discretion or a clearly unwarranted exercise of discretion" or "made upon unlawful procedure" and, accordingly, the circuit court was correct in affirming the commissioner's final order.

## IV. CONCLUSION

Based on the foregoing analysis, we affirm the circuit court's August 27, 2002 judgment.

Concurring and Dissenting Opinion by Acoba, J.

Assuming, *arguendo*, for purposes of this case, that Hawai'i Revised Statutes (HRS) § 485–25(a)(2) and (3) (1993) do not embody a scienter requirement[1] and in light of the majority's reliance on *Aaron v. Sec. & Exch. Comm'n*, 446 U.S. 680, 100 S.Ct. 1945, 64 L.Ed.2d 611 (1980), in this court's construction of HRS § 485–25(a)(1) to (3) (1993), I would remand this case to the circuit court of the first circuit, in order to consider the presence of scienter,[2] or lack thereof, on the part of Respondents–Appellants–Appellants TriVectra, Inc., Curtis N. Gushi, and Donovan D. Oda (collectively Appellants) as a mitigating or aggravating factor in determining the propriety of the imposition of the maximum civil penalty of $100,000 on Appellants under HRS § 485–20.5(a) (1993) by Appellee–Appellee Ryan S. Ushijima, in his capacity as Commissioner of Securities, Department of Commerce and Consumer Affairs, State of Hawai'i (the Commissioner).

Under *Aaron*, the Court, in deciding whether an injunction should issue, concluded that scienter is not an element required to be pled or proven under sections 17(a)(2) and (a)(3) of the Securities Act of 1933. *See Aaron*, 446 U.S. at 700–01, 100 S.Ct. 1945. The majority observes that HRS §§ 485–25(a)(2) and (a)(3) appear identical to those provisions of the Securities Act of 1933. Majority opinion at 13–14. As recognized in

---

1. It is arguable that, in *our* interpretation of Hawai'i Revised Statutes (HRS) § 485–25(a)(2) and (3) (1993), those provisions should be construed as embodying a scienter requirement inasmuch as (1) the language of 485–25(a)(2) resembles the common law definition of fraud, *see Kawaihae v. Hawaiian Ins. Cos.*, 1 Haw.App. 355, 360, 619 P.2d 1086, 1090 (1980) (noting that "[f]raud" has been defined as "[a] false representation of a matter of fact ... which deceives and is intended to deceive another so that he shall act upon it to his legal injury"), and 485–25(a)(3) expressly refers to "fraud or deceit," *see Manns v. Skolnik*, 666 N.E.2d 1236, 1248 (Ind.Ct.App. 1996) (concluding that I[ndiana] C[ode] § 23–2–1–12(3), virtually identical in language to HRS § 485–25(a)(3), which "makes it unlawful to engage in a manner which 'operates or would operate *as fraud or deceit upon any person* [,]' ... expressly include[s] as an element an intent to defraud" (emphasis in original)), (2) the legisla-

tive history indicates that the legislature's objective was to interdict "securities *fraud,*" (emphasis added), *see* Hse. Stand. Comm. Rep. No. 406, in 1985 House Journal, at 1175, and (3) strict liability should not be easily read into statutes, *cf. State v. Rushing*, 62 Haw. 102, 105, 612 P.2d 103, 106 (1980) (opining that "the legislative purpose to impose absolute liability should not be discerned lightly by the courts").

However, since the question of whether scienter attaches to 485–25(a)(2) and (3) is not raised by Appellants, I do not discuss it further.

2. As used by the United States Supreme Court in *Aaron v. Sec. & Exch. Comm'n*, 446 U.S. 680, 686 n. 5, 100 S.Ct. 1945, 64 L.Ed.2d 611 (1980), the term "scienter" is defined as "a mental state embracing intent to deceive, manipulate, or defraud."

*Aaron,* although scienter need not be plead or proven for violations of sections 17(a)(2) and (3), it nevertheless can be considered in determining relief. *See Aaron,* 446 U.S. at 701, 100 S.Ct. 1945 (stating that "a district court may consider scienter or lack of it as one of the aggravating or mitigating factors to be taken into account in exercising its equitable discretion in deciding whether or not to grant injunctive relief"). Inasmuch as the imposition of a fine, like equitable relief, is an alternate or complementary remedy for the same violations under HRS §§ 485–25(a)(1), (2), and (3), and as here, where violations were found under all three provisions, it would be reasonable and logical that "scienter or lack of it" be considered as "one of the aggravating or mitigating factors" in arriving at the amount of the fine.

Appellants contended that the award of a $100,000 fine was arbitrary and capricious. It is evident the Commissioner took the position that scienter was not required under HRS § 485–25(a)(2) or (a)(3) and accordingly did not consider the lack of scienter as a mitigating factor in assessing the maximum fine. The majority observes that "the [C]ommissioner did not find that [Appellants] acted with malicious or willful intent." Majority op. at 18. Yet, the maximum fine allowed of $100,000 was imposed upon Appellants for their supposed violations. Inasmuch as the majority has construed HRS § 485–25 pursuant to *Aaron,* I believe that a remand is appropriate in order for the Commissioner to consider as a mitigating or aggravating factor, in imposing such a fine, whether Appellants' violations of HRS § 485–25(a)(2) and (a)(3) were made with scienter.